Argued and submitted February 28, ballot title certified as modified
September 28, 1995

Daniel A. ROONEY
and Julie Davis,
*Petitioners,*

*v.*

Theodore KULONGOSKI,
Attorney General, State of Oregon,
*Respondent.*

(SC S41985)

Lon T. MABON,
*Petitioner,*

*v.*

Theodore KULONGOSKI,
Attorney General, State of Oregon,
*Respondent,*

*and*

Daniel A. ROONEY
and Julie Davis,
*Intervenors.*

(SC S41999)
(Consolidated for Argument and Opinion)

902 P2d 1143

16

Charles F. Hinkle, ACLU Foundation of Oregon, Inc., Portland, argued the cause and filed the petition for petitioners Daniel A. Rooney and Julie Davis.

Lawrence J. Hall, Silverton, argued the cause and filed the petition for petitioner Lon T. Mabon.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause and filed the responses for respondent. With him on the responses were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

GILLETTE, J.

Unis, J., dissented and filed an opinion in which Durham, J., joined.

## GILLETTE, J.

This is a ballot title proceeding consolidating two petitions that challenge the Attorney General's certified ballot title for a proposed initiative measure that has been designated as "Elections Division #13" by the Secretary of State's office. Petitioner Lon T. Mabon is a chief petitioner for the measure. He submitted timely written comments to the Secretary of State concerning the draft ballot title and thereby preserved the right to reiterate those positions in this challenge to the Attorney General's certified ballot title. ORS 250.067(1), 250.085(2). Petitioners Daniel A. Rooney and Julie Davis (hereafter collectively "Rooney") also have complied with the statutory requirements. Both Mabon and Rooney challenge the Attorney General's certified Caption, Question, and Summary for the ballot title.

Before turning to the merits of the parties' contentions regarding the adequacy of the Attorney General's wording of the ballot title, we consider three threshold issues. The first two pertain to the fact that Lon T. Mabon is a chief petitioner for four separate ballot measures, all of which relate to the same general subjects and use text that is often similar or identical,[1] designated by the Secretary of State as Elections Division numbers 13, 17, 21, and 25.

## THE ATTORNEY GENERAL'S POSITION

■ As noted, the petitions at issue in this consolidated case concern Elections Division #13. During oral argument

---

[1] Each of those other ballot measures has generated its own challenges to the Attorney General's ballot title for that measure. The consolidated challenges to the Attorney General's certified ballot title for Elections Division #17, *Mabon v. Kulongoski,* S42051, and *Rooney v. Kulongoski,* S42055, are decided today in *Mabon v. Kulongoski (Elections Division #17),* 322 Or 65, 902 P2d 1171 (1995); the consolidated challenges for Elections Division # 21, *Rooney v. Kulongoski,* S42101, and *Mabon v. Kulongoski,* S42108, are decided today in *Rooney v. Kulongoski (Elections Division #21),* 322 Or 77, 902 P2d 1177 (1995); and the consolidated challenges on Elections Division #25, *Rooney v. Kulongoski,* S42105, and *Mabon v. Kulongoski,* S42107, are decided today in *Rooney v. Kulongoski (Elections Division #25),* 322 Or 90, 902 P2d 1183 (1995).

Four other proposed ballot measures, also on the same general subject, were submitted to the Secretary of State and received certified ballot titles from the Attorney General. Each of those ballot titles also was challenged in this court, but the measures subsequently were withdrawn by the chief petitioners. We therefore dismissed the petitions challenging the Attorney General's certified ballot titles with respect to those measures.

to this court, one of the counsel for Mabon informed us that a total of eight proposed measures had been submitted to the Secretary of State, but that the chief petitioners intended to circulate no more than one of the measures for signatures. That statement later was clarified, however, during oral argument in the challenge to the ballot title for Elections Division #17, when another counsel informed us that the chief petitioners intend to circulate for signatures one *or more* of the remaining proposed measures (by that time reduced in number to four), once the ballot title preparation and challenge process is completed.

The Attorney General argues that an opinion by this court concerning this or any of the three other challenged ballot titles[2] would constitute an advisory opinion, for which the court lacks constitutional authority, and that the court therefore should refuse to certify any ballot title. When initially made, that argument was based on the factual premise that the chief petitioners intended to circulate one of four (or, perhaps, one of eight) proposed measures for signatures and the consequent legal assertion that the existence of a justiciable case or controversy as to *any* of the cases was, therefore, speculative. As noted above, however, various counsel for the chief petitioner have since left open the possibility that the chief petitioner may circulate *all* the measures presently before the court. The real possibility that the chief petitioner will circulate each of the proposed measures for signatures negates the legal and factual premises of the Attorney General's "advisory opinion" theory. It is not well taken.

## ROONEY'S POSITION

Rooney asserts that the court should either (1) impose a sanction against Mabon for misuse of the ballot title process; (2) require the chief petitioners to identify which proposed measure or measures they intend to circulate, before the court will issue a decision in any of the four pending cases; or (3) certify an identical ballot title for each measure.[3] We consider those contentions in turn.

---

[2] The Attorney General's assertion applies equally to all four of the ballot title challenges that remain pending. We discuss it here, in the lead opinion.

[3] Rooney's contentions originally were based, at least in part, on the aforementioned statement by counsel for the chief petitioner that the chief petitioner

■ Rooney first asserts that the submission by the chief petitioner of multiple measures on the same general subject is an abuse of the initiative process, because what the chief petitioner really is doing is shopping for a ballot title: He can review the ballot titles certified for each of the proposed measures and circulate the measure with the ballot title most to his liking. Rooney relies on the court's "inherent" authority to impose sanctions to protect the integrity of the judicial process from such abuse.

We have some difficulty with Rooney's premise. Rooney does not point to any way — and we know of none — in which the chief petitioner has failed to comply with the statutes pertaining to the initiative process. Assuming (without deciding) that Rooney is correct in labeling the chief petitioner's sponsorship of multiple proposed measures as a shopping expedition, that expedition does not appear to violate the ballot title preparation and certification process, of which this court's judicial review is merely one part. It may be that the next legislature will wish to consider whether such activities by sponsors of initiative measures is an abuse that calls for some reform in the process but, at this time, the chief petitioner has done no more than the law permits. Assuming — again, without deciding — that we would have the authority to do so, we decline to consider imposing a sanction under such circumstances.

■ Rooney next asserts that the court should require the chief petitioners to disclose which proposed measure or measures they intend to circulate, before the court will certify a ballot title. That assertion is akin to the underlying contention made by the Attorney General regarding advisory opinions, *i.e.*, it assumes that the court is being asked to render decisions regarding the ballot titles for some proposed measures that will never see the light of the signature-gathering day. That assertion also has the same factual and legal infirmities as the advisory opinion theory argued by the Attorney General and, similarly, is not well taken.

---

intended to circulate only one of the proposed measures for signatures. As noted above, since that time, counsel for the chief petitioner has stated that he intends to circulate one or more, rather than one at most, of the proposed measures for signatures. Because Rooney's motion applies equally in its proposed effects to all four of the pending measures, we consider the merits of Rooney's position in this opinion.

■ The Attorney General has certified four differently worded ballot titles for the four proposed measures. Rooney's final argument, before addressing the merits, is that application of ORS 250.035(2) should lead to the certification of the *same* ballot title for each of the four pending measures. That statute provides:

"The ballot title shall not resemble, so far as probably to create confusion, any title previously filed for a measure to be submitted at that election."

As a general proposition, our task in ballot title review cases, pursuant to ORS 250.085(5),[4] is to determine whether the Attorney General's decision to certify a *particular* ballot title for a *particular* proposed measure constitutes "substantial compliance with the requirements of ORS 250.035." In the present cases, however, in which the four proposed measures all deal with the same topic, Rooney essentially is asking us to hold that substantial compliance with ORS 250.035(2) would require the Attorney General to certify the same ballot title for each of the pending measures.

■ To discern the legislative intent behind a statute, we look first to the statute's text and context and, if the legislature's intent is clear from that inquiry, then we look no further. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). ORS 250.035(2) starts from the unexceptional premise, implicit in its text and consistent with the overall statutory context, that a proposed initiative measure will receive a ballot title. *See* ORS 250.035(1) (form of ballot title of any initiated measure); ORS 250.065, 250.067, and 250.085 (procedures for preparation and certification of ballot title).

Assuming for the purpose of discussion that all the proposed measures are identical in material respects (as Rooney asserts is the case),[5] there are three conceivable

[4] The legislature, at its recently concluded session, modified this court's ballot title review functions in certain particulars. Or Laws 1995, ch 534. However, that measure applies only to proposed measures that are filed with the Secretary of State after its operative date — July 7, 1995 — and therefore has no application to the cases that we decide today.

[5] Rooney asserts that, "[d]espite the wording variations, there is no doubt that the subject, purpose, and effect of each of [the measures] is identical." We understand that assertion to mean that the measures are identical with respect to

permutations of ORS 250.035(2) when it comes to certifying ballot titles for the measures: (1) the statute requires certifying the same ballot title for each measure; (2) the statute requires certifying different ballot titles for each measure; or (3) the Attorney General can comply substantially with the statute by certifying the same ballot titles, similar ballot titles, or different ballot titles, depending on the measures and recognizing the possibility that more than one of the choices may constitute substantial compliance in a given situation.

The first permutation, *viz.*, certifying the same ballot title for all, is the obverse of the statutory text. The statute provides that ballot titles shall not resemble each other so far as to create confusion. The obverse of that proposition is that ballot titles shall resemble (or perhaps be identical with) each other to avoid confusion. There is, however, no support in the text or the context of the statute for a conclusion that the statute necessarily mandates its obverse. A fair inference from the statute is that a ballot title *may* resemble (or perhaps be identical with) another, if to do so probably will not create confusion, but the statute cannot support the construction that a ballot title *must* resemble or perhaps even be identical with another to avoid confusion.

Neither is the second permutation, *viz.*, different ballot titles are *always* required, contemplated by the statute. There is nothing in the statute's text or context to suggest that it requires a differently worded ballot title for a measure that is materially identical to another measure.[6]

We turn to consider the third permutation. As noted above, one fair inference from the statute is that a ballot title

---

the features with which a ballot title must deal under ORS 250.035(1): a Caption that identifies *the subject*, a Question that states *the chief purpose*, and a Summary of the measure and its *major effect*. That is the way in which we use the term "identical in material respects."

[6] Rooney asserts that, if the statute were read to require different wording in ballot titles for essentially the same proposed measures, then it would produce an absurd or unreasonable result, contrary to a rule of statutory construction that admonishes courts to construe a statute "if possible so that it is reasonable and workable and consistent with the legislature's general policy." *McKean-Coffman v. Employment Div.*, 312 Or 543, 549, 824 P2d 410 (1992). Because the statute cannot be read always to require different wording for essentially the same measures, there is no likelihood of an assertedly absurd or unreasonable result.

may resemble (or perhaps be identical to) another, if it probably will not create confusion. And it follows easily from the text that a ballot title may be different from another, if it probably will not create confusion. That is, the overall statutory concern is with the probable creation of confusion, and the statutory mandate is that ballot titles shall not resemble each other so far as probably to create confusion. Thus, the permissible amount of resemblance between or among ballot titles in a given situation must be a function of that particular situation. The statute prescribes no one choice for all situations; indeed, more than one choice may satisfy the statute in any given situation.

■ The third permutation thus is consistent with the text and context of the statute; the other interpretive options are insupportable. We therefore hold that the Attorney General may comply with ORS 250.035(2) by certifying identical, similar, or different ballot titles for materially identical proposed measures, depending on the measures and recognizing that, in certain situations, more than one of those options may be an acceptable form of substantial compliance. Of course, the statute is not limited by its terms to situations in which the measures are materially identical. The statutory rule is the same, and the same principles regarding the prevention of confusion apply with equal force if the measures are not materially identical.

■ Having stated the proper office for ORS 250.035(2), our next task is to describe and then to implement a methodology that will enable us to certify ballot titles for the various measures pursuant to ORS 250.085, while taking both ORS 250.035(1) and (2) into account.

The nature of the inquiry under each of those statutory subsections, ORS 250.035(1) and (2), dictates the order in which they will be considered in a ballot title review proceeding. Under subsection (1), the focus is on the content of ballot titles for *individual* proposed measures. By contrast, the focus of subsection (2) is limited to situations in which there are at least two proposed ballot measures that necessitate a comparison of their respective ballot titles. It follows that, in performing our review function, we should proceed from the particular to the general, *i.e.*, we first should focus on the requirements of subsection (1) with respect to the

particular proposed measure before us. Although subsection (2) plays a role in the final analysis, comparison of ballot titles to determine whether they probably will create confusion comes second, not first. This is compelled not only by logic but by necessity. Neither the Attorney General nor this court can know or predict what proposed measures will be circulated, with what relative vigor signatures for those measures will be sought, or which measures actually will receive sufficient signatures to be placed on the ballot. The first responsibility of the Attorney General and the court to the electorate, therefore, is to ensure an accurate ballot title properly describing the individual measure.

Accordingly, we will proceed as follows to decide the ballot title challenges in the present case, along with those mounted with respect to Elections Division numbers 17, 21, and 25:

1. In each case, we will perform an independent inquiry into the validity of the particular challenges made by petitioners, to determine whether the Attorney General's certified ballot title substantially complies with the requirements of ORS 250.035(1).

2. If the Attorney General's certified ballot title is not deficient in the particulars asserted by petitioners under the requirements of ORS 250.035(1), that ballot title will be changed thereafter only if it becomes necessary to do so to bring about substantial compliance with ORS 250.035(2).

3. If the Attorney General's certified ballot title is deficient in one or more particulars asserted by petitioners, then the court will draft a ballot title that cures any defect. Thereafter, that ballot title will be changed only to the extent necessary to comply with the requirements of ORS 250.035(2).

4. Once the court has proceeded through steps 1 to 3 and has thus adjudicated the validity of all the particular claims under ORS 250.035(1) as to all the measures, then it will consider Rooney's contention that application of ORS 250.035(2) should result in the certification of the same ballot title for each of the measures. That discussion will be found at the conclusion of this opinion.

## SEPARATION OF POWERS

■ In addition to the foregoing arguments, an issue arose at oral argument in this case, during colloquy between members of the court and counsel for the parties, concerning whether our ballot title review function offends the principle of separation of powers. We hold that it does not.

The separation of powers is required by Article III, section 1, of the Oregon Constitution, which provides:

"The powers of the Government shall be divided into three seperate (*sic*) departments, the Legislative, the Executive, including the administrative, and the Judicial; *and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided.*"

(Emphasis supplied.) Clearly, the enactment by the people of initiative or referendum measures is a legislative act. Or Const, Art IV, § 1 ("The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly."). But, concerning the initiative and referendum process, there is an express constitutional provision that allows the legislature to enlist the other branches of government. Article IV, section 1(4)(b), of the Oregon Constitution, provides:

"Initiative and referendum measures shall be submitted to the people as provided in this section *and by law not inconsistent therewith.*"

(Emphasis supplied.)

Although the Oregon Constitution does not require the preparation of ballot titles, we shall assume, for the purposes of this case, that the preparation of a ballot title is a legislative function. It is obvious that such ballot titles can significantly enhance the initiative and referendum process by helping voters to inform themselves, on as objective a basis as possible, concerning the nature of the measures before them. The ballot title process, including the judicial review portions of that process, thus is a part of the legislature's response to the power conferred on it by Article IV, section 1(4)(b), to enact laws governing the initiative and referendum process that are "not inconsistent" with that process. Case law from this court supports this same proposition.

This court addressed a similar issue in *In re Ballot Title*, 247 Or 488, 433 P2d 1 (1967). The Attorney General there had prepared a ballot title which, pursuant to a 1967 legislative act, automatically went to this court for "review" to determine if it met statutory requirements. If the ballot title was deemed to be "sufficient," then the court was to file it with the Secretary of State; if the court found that the ballot title did not meet the statutory requirements, then it was to "write a substitute ballot title" and file it with the Secretary of State. 247 Or at 490. The court explained its conclusion that the ballot title "review" statute was unconstitutional, in violation of Article III, section 1, of the Oregon Constitution (the separation of powers provision), this way:

> "Section 4 [of Oregon Laws 1967, chapter 364,] states that it is now our duty to 'review' the title prepared by the Attorney General and either approve it or write a substitute title and file it with the Secretary of State. It is proposed that we do this without any form of judicial process; without parties being summoned or otherwise appearing who would be governed by the action taken, and without rendering an enforceable judgment. It is clear that the statute attempts to require the court to render a nonjudicial, advisory opinion.
>
> "* * * * *
>
> "[T]he present statute seeks to have the court perform a nonjudicial function, contrary to the prohibition of Art III, § 1."

Id. at 491-92, 495.

In contrast to the statute held to be invalid in the case of *In re Ballot Title*, the current statutory scheme has none of the same infirmities. This court does not review all ballot titles, but only those in which there has been a challenge filed in this court. Those challenges are concrete disputes, brought by interested parties. The court has a limited, statutorily prescribed standard of review and engages in review of specific challenges to the Attorney General's certified ballot title to determine whether it is in substantial compliance with the statutory requirements. ORS 250.085(5). This is a by-now familiar exercise, familiar in its own context but familiar also because it is no different in its adjudicative essence than is the review of any other Executive Department action that ordinarily comes before the

courts in the context of judicial review under the Oregon Administrative Procedures Act, ORS 183.480 *et seq.*

The Attorney General has conducted a statutorily prescribed function of that office, and a court challenge has been brought contesting the legal validity of his action. We can find no basis under the premises of the decision in *In re Ballot Title* to suggest that there is any constitutional separation of powers or other principle limiting judicial authority to adjudicate such a claim. The fact that ballot title decisions may say something, before a measure is circulated for signatures, about the measure, its subject, chief purpose, and major effect, does not turn the court's decision into an unconstitutional exercise of a nonjudicial function. Rather, any such observations occur only in the context of determining whether the Attorney General's linguistic choices in the challenged ballot title meet statutory standards. In other words, in determining the validity of the Attorney General's certified ballot title, the court *is performing its case-deciding function.* In certifying a ballot title to the Secretary of State, the court affords to the parties whatever relief, if any, to which they are entitled pursuant to the justiciable challenge that was brought.

The fact that the court is asked to adjudicate an otherwise justiciable case *during the electoral process* does not alter the foregoing analysis. *See generally OEA v. Roberts,* 301 Or 228, 721 P2d 833 (1986) (approving judicial review of whether the Secretary of State had properly discharged her responsibility to review proposed laws for compliance with the constitutional one-subject rule); *see also State ex rel Keisling v. Norblad,* 317 Or 615, 860 P2d 241 (1993) (mandamus authority of this court available to adjudicate a pre-election dispute over whether the Secretary of State was obliged to place a measure on the ballot).[7]

---

[7] Although deeming the controversy to be justiciable, the court's majority dismissed the petition as untimely. Justice Unis, writing separately to concur specially in the court's decision, agreed that the pre-election controversy was justiciable, but would have stepped into the electoral process before the election to adjudicate the merits of the claim regarding the Secretary of State's authority. *Keisling,* 317 Or at 633-38. He quoted with approval from *State ex rel v. Newbry et al,* 189 Or 691, 697, 222 P2d 737 (1950), where this court stated: "Any interference by the courts with the enactment of an initiative measure, *where all statutory requirements had been complied with,* would in itself be a violation of the constitutional separation of the powers of government." *Keisling,* 317 Or at 634 (emphasis

The fundamental genius of the constitution may be found in the creation and separation of three distinct branches of government.[8] But that separation is not always complete, and the roles that governmental actors are asked to play not infrequently interact in material ways. Thus, this court has recognized that the separation of powers does not require or intend an absolute separation between the departments of government. *SER Acocella v. Allen*, 288 Or 175, 180-81, 604 P2d 391 (1980); *Boyle v. City of Bend*, 234 Or 91, 100-02, 380 P2d 625 (1963). Rather, the court has cautioned that a violation of separation of powers may be found only if the problem is clear, *State ex rel Emerald PUD v. Joseph*, 292 Or 357, 361, 640 P2d 1011 (1982), and has set out two inquiries to determine whether there is a separation of powers violation.

The first inquiry is whether one department of government has "unduly burdened" the actions of another department in an area of responsibility or authority committed to that other department. *Id.* at 361-62; *Ramstead v. Morgan*, 219 Or 383, 399, 347 P2d 594 (1959). That inquiry corresponds primarily to the underlying principle that separation of powers seeks to avoid the potential for coercive influence between governmental departments. *See Monaghan v. School District No. 1*, 211 Or 360, 364-66, 315 P2d 797 (1957) (recognizing the principle). The second inquiry is whether one department is performing the functions committed to another department. *State ex rel Frohnmayer v. Oregon State Bar*, 307 Or 304, 310, 767 P2d 893 (1989); *In re Ballot Title*, 247 Or at 495. That inquiry corresponds primarily to the underlying principle that separation of powers seeks to avoid the potential for concentration of separate powers in one department. *Monaghan*, 211 Or at 364-65.

It appears clear that the court's role in adjudicating challenges to the legal adequacy of the Attorney General's ballot title does not place an "undue burden" on the Executive Branch, here personified by the Attorney General. As

---

added). Of course, the present cases are *about* whether "all statutory requirements have been complied with."

[8] The separation of powers is deemed to be "essential to the preservation of liberty." Alexander Hamilton or James Madison, The Federalist (No. 51), *quoted in Monaghan v. School District No. 1*, 211 Or 360, 364, 315 P2d 797 (1957).

noted above, judicial review of the Attorney General's acts done pursuant to statute is a well-established role for the court and does not present the potential for the court to influence coercively the Attorney General. *See generally Lipscomb v. State Bd. of Higher Ed.*, 305 Or 472, 478-79, 753 P2d 939 (1988) (traditional divisions of authority and exercises of power are considered with due respect by the courts in the constitutional analysis, although the existence of a historically accepted practice will not be dispositive). Neither is the court's adjudicatory role an impermissible burden on the court. The court is being asked only to carry out classic adjudicatory functions in the context of a live controversy between truly contending parties. It is not being asked to perform the functions committed to the Attorney General. The legislature has corrected the statutory scheme held invalid in 1967 in the *In re Ballot Title* decision, which did amount to a shift of functions, and the present system now limits the court to a proper adjudicatory role.

We turn to the remaining branch of government. The people, when carrying out their responsibilities under the initiative and referendum process, are a part of the Legislative Department of government. Or Const, Art IV, § 1 (2)-(5). But for purposes of a separation of powers analysis, it is clear that the court is not placing an undue burden on the people, in an area committed to the people, nor is the court performing a function committed to the people. The ballot title preparation process has never been a function that the people have chosen to reserve to themselves. Rather, the other part of the Legislative Branch, the Legislative Assembly, has by statute placed the responsibility for preparing ballot titles in the Executive Department, subject to judicial review by this court.

To summarize: The role accorded the court in the ballot title process is a proper adjudicatory function, well within the court's recognized range of judicial authority. The exercise of that authority does not unduly burden the Attorney General (as part of the Executive Branch) or the people (as part of the Legislative Branch), or vice versa, nor does it perform a function committed to either of them. This court

does have the constitutional authority to decide the ballot title challenges at issue here.

## THE PARTIES' CHALLENGES

Subject to the methodological principles discussed above, we now consider the challenges of the parties to the Caption, Question, and Summary, respectively. We review the Attorney General's certified ballot title for "substantial compliance" with the statutory requirements, pursuant to ORS 250.085(5). We begin by setting out the full text of the measure and of the Attorney General's certified ballot title.

*The Measure*

Elections Division #13 states:

"THE MINORITY STATUS AND
CHILD PROTECTION ACT OF 1996
AN ACT

"The People of the State of Oregon do enact as follows:

"The Constitution of the State of Oregon is amended by creating a new section to be added to and made a part of Article 1. The new section shall be known as 'The Minority Status and Child Protection Act of 1996,' and will read as follows:

"SECTION 41: MINORITY STATUS BASED ON SEXUAL BEHAVIOR PROHIBITED

"1. Minority status shall not be based on sexual behavior or desires; therefore,

"(a) Children, students and employees shall not be advised, instructed or taught by any government agency, department or political subdivision that a person's sexual behavior or desire is the legal or social equivalent to existing minority civil rights classifications.

"(b) The People find that to be morally opposed to certain sexual behaviors such as homosexuality, when based upon a person's convictions, is a Right of Conscience in accord with Article 1 Section 2 and 3 of this Constitution. Such objection produced by one's moral standards and values is therefore not discrimination relating to civil rights, nor shall it be considered so by any unit of state or local government; therefore,

"(1) Public funds shall not be expended in a manner that has the purpose or effect of expressing approval of homosexuality.

"(2) Marital status shall not be recognized or spousal benefits awarded on the basis of homosexuality.

"2. Though subsection one is established and in effect, no licenses, permits, services or benefits shall be denied any person otherwise due under existing statute; nor shall the holding or exercise of any rights guaranteed by the Constitution of the State of Oregon or of the United States of America be deprived, nullified or diminished.

"3. Though subsection one is established and in effect, with regard to public employees, it shall be generally considered that a person's private lawful sexual behavior is a non-job related factor, provided such consideration does not violate any provision of this Act or of the Constitution of the United States.

"4. Though subsection one is established and in effect, books or literature in public libraries which promote or express approval of homosexuality shall be kept from minors; access made available only under parental supervision. Such material must meet local community standards established through the existing library review process.

"5. The term minority status shall refer to any class or category of individuals created in the law as a special civil rights classification such as race, religion, gender, national origin, etc.

"6. The PEOPLE INTEND that if any part of this enactment be found unconstitutional, the remaining parts shall survive in full force and effect. This Act shall be in all parts self-executing. For the purposes of this Act, every Oregon resident and non-profit entity doing business in the State of Oregon has standing."

The Attorney General's certified ballot title for Elections Division #13 states:

"AMENDS CONSTITUTION:
HOMOSEXUALITY, OTHER SEXUAL
BEHAVIOR NOT CIVIL RIGHTS BASIS

"QUESTION: Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; bar spending public funds in way approving homosexuality?

"SUMMARY: Amends state constitution. Forbids basing civil rights on homosexuality, other sexual behavior or desires. Government cannot:

"— teach or advise children, students, employees that sexual behavior or desires equate legally or socially to existing civil rights classifications;

"— recognize marital status, or grant spousal benefits based on homosexuality;

"— spend public funds in way expressing approval of homosexuality.

"Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Bans pro-homosexuality books from public libraries unless books meet established local community standards."

## THE CAPTION

■ ORS 250.035(1)(a) requires a Caption of not more than 10 words that "reasonably identifies the subject of the measure."

Rooney asserts that *homosexuality* is the subject of the measure and that the term "other sexual behavior" is not a necessary piece of the Caption. He also asserts that the wording of the Caption is awkward, obscure, and unclear, and should be changed to state, "AMENDS CONSTITU-TION: FORBIDS CIVIL RIGHTS PROTECTION BASED ON HOMOSEXUALITY." We agree with Rooney's criticism with respect to the Caption's clarity. The awkwardness and lack of clarity undoubtedly stem from the phrase "not civil rights basis," which leads to queries such as "basis of what?"

The Attorney General responds that the ballot title substantially complies with the statutory requirement that a Caption "reasonably identifies the subject of the measure." ORS 250.035(1)(a). The Attorney General also acknowl-edges, however, that the wording of the Caption is awkward and agrees that inclusion of the term "other sexual behavior" will have little practical impact. If the court concludes that the Caption is flawed, the Attorney General would not object to Rooney's proposed substitute wording.

On a related point, Mabon contends that the Cap-tion is inaccurate, misleading, and confusing. Mabon asserts that the Caption misstates the main subject of the initiative, which is that sexual behavior of any kind simply should not be the basis for a "minority" classification. He specifically

objects to the singling out of homosexuality in the Caption (contending that the measure applies to "any form of sexual behavior, heterosexual, transgender or otherwise") and, relying on *Sampson v. Roberts,* 309 Or 335, 340, 788 P2d 421 (1990), asserts that the Attorney General should use the actual words of the measure. He proposes a Caption that states, "AMENDS CONSTITUTION: PROHIBITS MINORITY STATUS BASED ON SEXUAL BEHAVIOR, DESIRES."

The wording of the measure is not limited to sexual behavior, but also includes provisions that relate to "sexual behavior or desires." (Sections 1 and 1(a).) The measure also either singles out or specifies "homosexuality" in four separate instances. (Sections 1(b) and 4.) Thus, although the measure does state that "minority status shall not be based on sexual behavior or desires," it also is clear from the text of the measure itself that the Attorney General's certified Caption, when it refers specifically to homosexuality in describing the subject of the measure, has substantially complied with the statutory requirement that the Caption reasonably identify the subject of the measure.[9] *Cf. June v. Roberts,* 301 Or 586, 589, 724 P2d 267 (1986) (rejecting the wording of an Explanatory Statement for a measure that referred to "an existing nuclear fueled thermal power plant in Oregon" and certifying an Explanatory Statement that named specifically the Trojan Nuclear Power Plant at Rainier, which was the only such entity in existence in Oregon).

The mandate of ORS 250.035(1) to present, in a few words, the subject, the chief purpose, and the major effect of a measure in a ballot title requires that judgments be made about the relative significance of the provisions of a measure. Although reference to "sexual behavior" in the broader sense might be appropriate in another portion of the ballot title, a Caption containing a 10-word description of the subject of

---

[9] In *Bernard v. Keisling,* 317 Or 591, 596, 858 P2d 1309 (1993), this court stated:

"We recognize that the potential exists for the proponents of an initiative measure either intentionally or unintentionally to use words in the measure that obfuscate the subject, chief purpose, summary, or major effect of the measure. In reviewing the ballot title certified by the Attorney General, this court will not hesitate to go beyond the words of the measure where such an outcome has occurred."

this measure (or, more accurately, an 8-word description of the subject of the measure, following the introductory phrase, "AMENDS CONSTITUTION") does not substantially comply with the statutory requirement when it includes reference to "other sexual behavior." Thus, some alteration to the Caption is appropriate.

Mabon also contends that the Caption should refer to "minority status," rather than "civil rights." He asserts that the measure uses and defines the term "minority status," and that the term is now widely understood and is clearer and more precise than "civil rights," which frequently evokes an emotional response. All parties agree that either civil rights or minority status is at the core of the measure and is properly included as a concept in any Caption identifying the subject of the measure.

This court previously rejected the use of the term "minority status" in a ballot title for a measure sponsored by the same chief petitioner, stating that the concept "has no recognized meaning outside of this measure." *Mabon v. Keisling,* 317 Or 406, 416, 856 P2d 1023 (1993). That remains true. Moreover, the Attorney General's Caption utilizes the words of the measure itself by referring to "civil rights," which is a term in common parlance that is utilized by the measure to define "minority status." Section 5 provides: "The term minority status shall refer to any class or category of individuals created in the law as a special *civil rights* classification such as race, religion, gender, national origin, etc." (Emphasis added.) The Attorney General's Caption substantially complies with the statutory requirement that it reasonably identify the subject of the measure when it refers to "civil rights."

To summarize, the Caption's express reference to "homosexuality" and its use of the term "civil rights" satisfy the requirements for a ballot title Caption. The inclusion of the phrase "other sexual behavior" does not. We will revise the Caption to reflect those decisions. Furthermore, the additional words available with the deletion of "other sexual behavior" can permit us to rectify the awkward phrasing in the Attorney General's Caption, although that awkwardness might not otherwise be an independent basis for a change.

Based on the foregoing analysis of the Attorney General's Caption, we conclude that an apt way to describe the proposed measure before us (and the other three proposed measures whose ballot title challenges also are resolved this date) is to say that the measure deals with the powers of state and local governments to affect homosexuality and homosexuals, and that it does so by specifically restricting those powers. We believe that that general subject is captured by the following Caption: "AMENDS CONSTITUTION: RESTRICTS LOCAL, STATE GOVERNMENT POWERS CONCERNING HOMOSEXUALITY." Subject to the qualifications noted below, we adopt that Caption as substantially complying with the requirements of ORS 250.035(1)(a).

Consistent with our methodology for certifying the ballot titles for these four related cases, the final wording for the Caption will be decided after application of ORS 250.035(2) (re: confusion among ballot titles). That discussion will be found later in this opinion. 322 Or at 43-47.

## THE QUESTION

ORS 250.035(1)(b) requires a Question of not more than 20 words that "plainly phrases the chief purpose of the measure." The chief purpose is the most significant aim or end that a measure is designed to bring about. *Mabon v. Keisling*, 317 Or at 413. The Attorney General's certified Question asks, "Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; bar spending public funds in way approving homosexuality?"

Mabon repeats his objection to the use of the term "civil rights," and we reject that position in this context as well. Mabon also contends that barring certain public funding is not a chief purpose of the measure, but rather is an effect of the chief purpose, which assertedly is to prohibit the granting of "minority status" based on sexual behavior or desires *and* to protect individual rights of conscience. Mabon proposes a Question that asks, "Shall Constitution be amended to prohibit minority status based on sexual behavior or desires and to protect rights of conscience?"

The Attorney General responds that a constitutional ban on expenditure of public funds is central to the chief purpose. He further asserts that one consequence of the

measure is that "the public spending provision of the measure would allow some or all homosexuals to be barred from public employment merely because they are homosexuals." The Attorney General also asserts that the "right of conscience" provision does nothing more than reiterate existing constitutional provisions and should not be featured as a chief purpose of the measure.

We do not find it necessary to the analysis in this case to agree or disagree with the Attorney General's legal conclusions respecting public employment and rights of conscience. It is sufficient for purposes of our review to conclude that the measure's express constitutional bar on expenditure of public funds "in a manner that has the purpose or effect of expressing approval of homosexuality" is properly characterized as a chief purpose of the measure. It is not an effect of the chief purpose, as Mabon characterizes it, because it is independent of and does not necessarily follow from the provisions regarding civil rights and minority status. Accordingly, we reject Mabon's challenge to the Attorney General's certified Question.

Rooney asserts that the chief purpose of the measure is that it seeks: (1) to give constitutional recognition to a right to discriminate (including one express use of the term "discrimination" in section 1(b)); (2) to prevent government from extending civil rights protections to homosexual persons; and (3) to prevent courts from recognizing a claim of discrimination based on a person's homosexuality. Rooney proposes to change the last clause of the Attorney General's Question, after the semi-colon, as follows, "Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; permit discrimination against homosexuality in spending public funds?"

The Attorney General responds that both his Question and Rooney's proposed alternative are accurate and that the measure "concerns discrimination on the basis of homosexuality." The Attorney General states that he declined to use the word "discrimination" in the Question because of this court's holding in *Mabon v. Keisling*, 317 Or at 416. In that case, this court rejected the Attorney General's use of the term "discrimination" in the ballot title and stated that "the use of the word 'discrimination,' while accurate, is better

avoided (if possible), because of the negative context in which that word normally is used."

The Attorney General's choice to use, in place of the word "discrimination," another accurate description is an acceptable choice, within the bounds of the substantial compliance for which we review ballot titles. Rooney's challenge, to compel the use of the term "discrimination" in the Question, is not well taken.

We have rejected each of the parties' challenges to the Attorney General's certified Question. Subject to the qualifications noted below, we accept the Attorney General's certified Question as substantially complying with the requirements of ORS 250.035(1)(b). It provides: "Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; bar spending public funds in way approving homosexuality?"

Consistent with our methodology for certifying the ballot titles for these four related cases, the final wording for the Question will be decided after application of ORS 250.035(2) (re: confusion among ballot titles). That discussion will be found later in this opinion. 322 Or at 47-49.

## THE SUMMARY

■■ ORS 250.035(1)(c) requires a "concise and impartial statement of not more than 85 words summarizing the measure and its major effects." The purpose of the Summary is to help voters understand "what will happen if the measure is approved," *Fred Meyer, Inc. v. Roberts*, 308 Or 169, 175, 777 P2d 406 (1989), but speculation about potential secondary effects is not permitted, *Mabon v. Keisling*, 317 Or at 414.

Mabon raises a number of challenges to the Attorney General's Summary. He first asserts that the Summary fails to mention that the measure would guarantee the right of conscience to object to certain sexual behavior without having the exercise of that right considered to be discrimination. Mabon seeks a sentence in the Summary that would say:

"Affirms constitutional right of conscience as basis to pro-hibit homosexual marriages and public expenditures approv-ing homosexuality."[10] The Attorney General again asserts that the measure does no more with respect to the right of conscience than existing provisions of the state constitution already provide.[11]

We disagree with Mabon's challenge, but not for the reason given by the Attorney General, as to which we express no opinion. We conclude that the Attorney General's Summary substantially complies with the statutory require-ments by conveying sufficient and accurate information about what would happen if the measure were to pass, including the asserted individual right to object to sexual behaviors without that objection being deemed discrimina-tion. The pertinent provision of the measure is section 1(b), which provides:

"1. Minority status shall not be based on sexual behav-ior or desires; therefore,

"* * * * *

"(b) The People find that to be morally opposed to cer-tain sexual behaviors such as homosexuality, when based upon a person's convictions, is a Right of Conscience in accord with Article 1 Section 2 and 3 of this Constitution. Such objection produced by one's moral standards and values is therefore not discrimination relating to civil rights, nor shall it be considered so by any unit of state or local government; therefore,

"(1) Public funds shall not be expended in a manner that has the purpose or effect of expressing approval of homosexuality.

"(2) Marital status shall not be recognized or spousal benefits awarded on the basis of homosexuality."

The Attorney General's Summary, in part, states:

---

[10] We note that the substitute wording that Mabon seeks does not neces-sarily correspond either to the underlying point that he makes or to the wording of the measure.

[11] Article I, section 2, of the Oregon Constitution, provides:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences."

Article I, section 3, provides:

"No law shall in any case whatever control the free exercise, and enjoy-ment of religeous (*sic*) opinions, or interfere with the rights of conscience."

"Amends state constitution. Forbids basing civil rights on homosexuality, other sexual behavior or desires. Governments cannot:

"* * * * *

"— recognize marital status or grant spousal benefits based on homosexuality;

"— spend public funds in way expressing approval of homosexuality."

The Attorney General's Summary conveys the idea that the measure amends the constitution and also lists two of the specifics set out by section 1(b) of the measure (public funding and marital status). The Summary also states that the constitution would forbid basing civil rights on sexual behavior or desires. Mabon argues that this is insufficient, because it fails to mention either the right of conscience or the fact that, if the proposed measure passed, the exercise of that right is not discrimination. Mabon does not, however, explain how his point is not covered conceptually by the Attorney General's statement that the effect of the measure would be for the constitution to forbid basing civil rights on sexual behavior or desires.

Whether a Summary states that government cannot base civil rights on sexual behavior or desires or, instead, states the corollary, *viz.*, that an individual decision to exercise a right of conscience on the basis of sexual behavior or desires is not discrimination cognizable by the government, is a choice that falls within permissible range of choices that the Attorney General could make. We conclude that, as against this challenge, the Attorney General's Summary substantially complies with the requirement that it be a concise and impartial summary of the measure and its major effects.

Mabon next contends that the Attorney General's Summary fails to mention the "safeguards" in section 2 of the measure and that this failure demonstrates bias. Mabon would insert a sentence in the Summary that states that the measure "[p]reserves basic constitutional rights and access to public services and privileges." The Attorney General responds that those "safeguards" are no more than the preservation of the status quo, which should not bear separate mention. The Attorney General also contends that

Mabon's proposed wording, which is not found in the proposed measure, would suggest that this court had given its imprimatur to the measure's constitutionality.

We agree with Mabon that section 2 is a major effect of the measure, at least as significant as other effects stated in the Attorney General's Summary, insofar as it states limitations on the effect of the measure if passed. Space permitting, it should be mentioned in the Summary. We also conclude, however, that Mabon's proposed substitute is argumentative and does not track the terms of the measure. We will certify a ballot title Summary for this measure that refers to the effect of section 2 of the measure.

Mabon next objects to the format of the Summary, asserting that voters who read quickly may be misled if they miss the word "cannot" in the phrase "Governments cannot." We reject that argument. If we may not assume that the voters can read, or that they are able to tell the difference between "can" and "cannot," then this entire exercise is senseless. We certified the same format in *Mabon v. Keisling*, 317 Or at 418, and Mabon's objection to it here is not well taken.

Mabon's final objection relates to how the Summary treats section 4 of the measure. That section provides:

"Though subsection one is established and in effect, books or literature in public libraries which promote or express approval of homosexuality shall be kept from minors; access made available only under parental supervision. Such material must meet local community standards established through the existing library review process."

Mabon objects to the sentence in the Summary that states that the measure "[b]ans pro-homosexuality books from public libraries unless books meet established local community standards." Mabon asserts that this is not so, but that the measure "would only require that pro-homosexuality books be available to minors with parental supervision, and meet local community standards established through existing library review processes." The Attorney General responds that the measure clearly provides that the books must meet community standards to be in the library.

The Attorney General has interpreted the measure in a particular way, and the parties are trying to draw the court into the same exercise.[12] Of course, any attempt to summarize or to distill a proposed measure by any formula of words short of a rote repetition of the measure will always involve at least minimal interpretation of the measure. But our task is to see to it that the interpretive exercise be minimal, because that is the best way to ensure that the Summary will meet the mandate of ORS 250.035(1)(c) that it be "concise and impartial." We therefore will revise the Summary's description of section 4 simply to summarize the language of the measure. Proponents and opponents of the measure are free to trumpet its purported effects or to point to its possible ambiguities, but it is not the court's role to engage in an abstract exercise of pre-enactment constitutional interpretation.

Rooney asserts that one major effect of the measure would be to invalidate *existing* local anti-discrimination ordinances. Rooney asserts that there is room in the Summary to refer to this and proposes that the Summary state: "Overturns local ordinances that protect homosexuals from discrimination in jobs, housing." The Attorney General agrees that the measure would make such ordinances unconstitutional. The Attorney General asserts that his ballot title substantially complies, but would not object to the addition of a sentence that would help the voters to understand this as one of the measure's major effects. The Attorney General proposes: "Bars [or bans, or forbids] local ordinances that protect homosexuals from discrimination in jobs, housing."

It may be, as Rooney argues and the Attorney General concedes, that one of the effects of the proposed measure would be to constitutionally nullify at least some local ordinances. But the possible range in the wording of such ordinances makes it difficult to be confident of any generalization concerning them.

---

[12] As one key example, the preceding referent for the key term, "[s]uch material," in section 4 of the measure arguably is unclear as to whether it refers generally to pro-homosexual books or only to those books that will be made available to minors with parental supervision. Accordingly, the sweep of the requirement of community standards review arguably is unclear with respect to whether it includes review only of those books that may be available to minors or review of all books. The Attorney General asserts that the requirement applies to all books. Mabon's response avoids that question, while at the same time disputing the Attorney General's position.

Moreover, it would extend well beyond this court's usual (albeit self-imposed) restraint to announce such an abstract ruling of constitutional interpretation. Finally, and given the very ordinance — specific nature of the constitutional ruling that Rooney seeks, it is not at all clear that the effect that Rooney wishes to have highlighted is so much more important than those subjects that the Attorney General has placed in his certified ballot titles that it is necessary, as a matter of law, to make a substitution. We hold that the addition that Rooney seeks is not necessary in order to ensure that the Attorney General's caption conforms to the requirements of ORS 250.035(1)(c).

To summarize: We reject the addition of a sentence to describe the effect of the measure on existing local ordinances. We reject the addition of a reference to the right of conscience and the contention that the format of the Summary is inadequate. We agree that the Summary should refer to the limitations in section 2, and we conclude that the description of the public library provision should summarize the wording of the measure. Subject to the qualifications noted below, we hold that the following Summary substantially complies with the requirement of ORS 250.035(1)(c) that there be a Summary that concisely and impartially summarizes the proposed measure and its major effects:

"Amends state constitution. Government cannot:

"— base civil rights on homosexuality, sexual behavior or desires;

"— deny other constitutional rights, or licenses, benefits, services under existing statutes;

"— tell children, students, employees that sexual behavior, desires equate to classifications like race, religion, gender;

"— recognize homosexual marital status, spousal benefits;

"— spend public funds approving homosexuality.

"Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Public libraries: Pro-homosexuality books available to minors with parental supervision, must meet local standards per review process."

We turn now to a discussion of whether, in light of the wording of the present proposed measure and the other measures that are before us today, the provisions of ORS 250.035(2) require us to modify the ballot title wording that we thus far have found to conform to statutory requirements.

## APPLICATION OF ORS 250.035(2)

Faced with multiple related measures and ballot title challenges, and having tentatively revised a number of ballot title provisions, both with respect to the present measure and with respect to Elections Division Numbers 17, 21, and 25, we now must consider the potential for confusion between and among the various titles.[13]

We begin by restating that ORS 250.035(2) provides: "The ballot title shall not resemble, so far as probably to create confusion, any title previously filed for a measure to be submitted at that election." We already have held that the statute may be satisfied by giving identical measures the same, similar, or different ballot titles, depending on the circumstance, and that more than one of those choices may be an acceptable choice for the Attorney General to make in a particular situation. 322 Or at 23. The statutory rule is the same, and the same principles regarding the prevention of confusion apply with equal force if the measures are not materially identical, although the danger that similar or identical ballot titles will be used under those circumstances is far less.

The stated purpose of ORS 250.035(2) is to help prevent voter confusion. We have noted in a companion case that the text of the measures for Elections Division #13 and #17 is nearly identical, and we deemed "the variance to be immaterial for purposes of a ballot title." *Mabon v. Kulongoski (Elections Division #17)*, 322 Or 65, 68 & n 2,

---

[13] Pursuant to ORS 250.085(5), we review the Attorney General's certified ballot titles for substantial compliance with ORS 250.035, including ORS 250.035(2). The statutes recognize that certain challenges may only become clear once the Attorney General has certified a ballot title, and challenges based on ORS 250.035(2) can be among those. ORS 250.085(1), (6) (challenges not raised before the Secretary of State nonetheless may be brought based on language added to or removed from the draft title after the comment period). By the same token, once the court adjudicates challenges that require revision of ballot titles for related measures, then contentions relating to ORS 250.035(2) may become pertinent in the court's considerations.

902 P2d 1171 (1995). Different ballot titles for two measures that are nearly identical textually and substantively would run too great a risk of confusing voters by suggesting that there are differences in the measures when such differences do not exist. Thus, we believe that the ballot titles for Elections Division #13 and #17 should be the same, and we will treat them accordingly in the analysis that follows.

1. *The Caption.* Set out below is a statement of each of the Captions and a summary of the pertinent rulings on the parties' challenges to those Captions.

a. *Elections Division #13*: "AMENDS CONSTITUTION: HOMOSEXUALITY, OTHER SEXUAL BEHAVIOR NOT CIVIL RIGHTS BASIS." We have held earlier in this opinion that the Caption's express reference to "homosexuality" satisfies the requirements for a ballot title Caption, while the inclusion of the phrase, "other sexual behavior," does not. In the course of that discussion, we concluded that the underlying point made by the Caption was a core point of the measure (a conclusion shared by all the parties in their briefing) and that it was properly included as a concept in a Caption. We concluded that the measure deals with the powers of state and local governments to affect homosexuality and homosexuals. Finally, we acknowledged the awkward phrasing of the Caption, which is remediable on revision. 322 Or at 32-35.

b. *Elections Division #17*: "AMENDS CONSTITUTION: LAWS CANNOT GUARANTEE EQUAL TREATMENT FOR HOMOSEXUAL PERSONS." We have held that the Caption does not satisfy the statutory requirements because of its rhetorical content. As with Elections Division #13, we have concluded that the underlying point made by the Caption was a core point of the measure and that it was properly included as a concept in the Caption. *Mabon v. Kulongoski (Elections Division #17)*, 322 Or at 71-73.

c. *Elections Division #21*: "AMENDS CONSTITUTION: BARS SPENDING PUBLIC FUNDS IN WAY APPROVING HOMOSEXUALITY." We have rejected this Caption as being too narrowly focused and not capturing the subject of the measure. Because that conclusion left us with no Caption, we were compelled to formulate a statement of

the subject of the measure. We pointed to the various provisions of the measure, all of which are contained in one form or another in Elections Division #13 and #17, and stated:

> "When a measure contains an affiliated grouping of separate provisions related by a common thread, the subject of the measure may well be most reasonably identified by characterizing the thread, rather than by focusing on one or more of the most significant constituent parts. This is consistent with the approach that we took quite recently to certifying a ballot title Caption for a measure with a similar range of provisions and subject matter. *Mabon v. Keisling*, 317 Or 406, 411-13, 856 P2d 1023 (1993) (rejecting a specific Caption for a more generally descriptive one). In this instance, we conclude that the subject of this measure likewise is best captured by reference to the common thread, rather than to any one or more pieces of the patchwork.

> "We conclude that the subject of this measure is properly characterized as a constitutional amendment that relates to the powers of state and local governments concerning homosexuality. That statement of the subject accurately and neutrally describes the measure and apprises the electorate of what subject they are being asked to consider."

*Rooney v. Kulongoski (Elections Division #21)*, 322 Or 77, 85-86, 902 P2d 1177 (1995).

 d. *Elections Division #25*: "AMENDS CONSTITUTION: BARS LEGAL PROTECTIONS BASED ON SEXUAL BEHAVIOR, DESIRE." We have disapproved of the use of the word "bars," concluding that the Caption should, if possible, recognize both the substance of the "minority status"[14] provision and the limitations on that provision as expressed in the measure. We also have recognized that, if the word "limits" is substituted for "bars," the foregoing goal is achieved. *Rooney v. Kulongoski (Elections Division #25)*, 322 Or 90, 97, 902 P2d 1183 (1995). With that substitution, the resulting Caption for this narrow measure complies with the requirements of ORS 250.035(1).

---

[14] As is true throughout our discussion of the measure in Elections Division #25, we set off the term "minority status" here with quotation marks because that term has no independent legal meaning outside the proposed measures in which it appears. *See Mabon v. Keisling*, 317 Or 406, 416, 856 P2d 1023 (1993) (so holding with respect to same phrase in measure there under review).

The foregoing demonstrates that three of these proposed measures — Numbers 13, 17, and 21 — are concerned with the same basic overall subject. The statement of that subject in the Caption for Elections Division #21 — that the measure would amend the constitution with respect to the powers of state and local governments concerning homosexuality — neutrally and accurately captures the subject of each of the measures, while also taking account of the particular rulings in each of the challenges to the Attorney General's Captions. With respect to Elections Division #13 and #17, a core concern of those measures — civil rights — which we deemed properly included as a concept in a Caption, is included in a Caption that communicates the general subject identified in the context of those cases and articulated more fully in Elections Division #21. Use of the word "homosexuality" is acceptable throughout. (*See, e.g.*, 322 Or at 33, rejecting a challenge to the Attorney General's use of the term "homosexuality" in the Caption for Elections Division #13). Finally, because the approach taken by the statement of the subject identifies the common thread in the proposed measures, it is consistent with the approach that we took under somewhat similar circumstances in *Mabon v. Keisling*, 317 Or at 411-13 (rejecting too narrow a focus in proposed Caption and certifying a more broadly descriptive Caption).

■ Because three of these four measures have the same subject, with interlocking choices of text in the measures, and because the Caption is a very short heading to advise the voters generally what the measure is about — is, in other words, a "relating clause" for a proposed piece of legislation — we believe that there will be too great a risk of voter confusion if we provide different Captions for those measures. The Captions, which describe the measures in the most general terms, will lead naturally to the more specific Questions, stating the chief purposes of the measures, and to the yet more specific Summaries, stating the major effects of the measures. As one moves from the general to the specific, then points of departure may become more appropriate. Accordingly, we certify the following Caption for the ballot title for Elections Division #13, #17, and #21:

"AMENDS CONSTITUTION:
RESTRICTS LOCAL, STATE GOVERNMENT POWERS
CONCERNING HOMOSEXUALITY"

■ With respect to the far narrower measure in Elections Division #25, however, the foregoing Caption would be far too broad. With respect to Elections Division #25, we certify the following Caption:

"AMENDS CONSTITUTION:
LIMITS LEGAL PROTECTIONS BASED ON
SEXUAL BEHAVIOR, DESIRES"

2. *The Question.* Set out below is a statement of each of the Questions and a summary of the pertinent rulings on the parties' challenges to those Questions in each of the four cases that we decide today:

a. *Elections Division #13*: "Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; bar spending public funds in way approving homosexuality?" We rejected all the parties' challenges to this Question and concluded, therefore, that it substantially complies with the statutory requirements. 322 Or at 35-37.

b. *Elections Division #17*: "Shall constitution say laws cannot guarantee equal treatment for homosexual persons, and forbid spending public funds in way approving homosexuality?" Consistent with our ruling on the Caption for the ballot title for this measure, we have concluded that the Question does not substantially comply with the statutory requirements because of the rhetorical content of its first clause. *Mabon v. Kulongoski (Elections Division #17)*, 322 Or at 72.

c. *Elections Division #21*: "Shall state constitution bar spending public funds in way approving homosexuality; forbid granting marital status, spousal benefits based on homosexuality?" We have concluded that the Question cannot refer to other specific provisions and at the same time omit reference to the substance of the "right of conscience" provision. *Rooney v. Kulongoski (Elections Division #21)*, 322 Or at 86-87.

d. *Elections Division #25*: "Shall state constitution bar laws defining a class of people for protection of rights based on sexual behavior or desires?" Consistent with the ruling on the Caption for the ballot title for this measure, which differs from the Caption for the other three measures

and closely follows the Attorney General's Caption, the Question certified by the Attorney General comes close to meeting the statutory standard.

As noted above, we will certify the same ballot title for Elections Division #13 and #17, which we deemed to be materially identical, textually and substantively. We also have noted that Elections Division #21 is essentially the verbatim equivalent of portions of Elections Division #13, albeit without other provisions of that proposed measure. *Mabon v. Kulongoski (Elections Division #17)*, 322 Or at 68 n 2.

We have held that the Attorney General's certified Question for Elections Division #13 substantially complies with the statutory requirements. Accordingly, it is also a sufficient Question for Elections Division #17. We also conclude that that Question accurately states the chief purpose of Elections Division #21, notwithstanding the fact that Elections Division #21 does not include all the text of the measure for Elections Division #13. Consistent with our conclusions in the context of the Captions, we conclude that there would be too high a risk of voter confusion if the voters were asked different Questions for these three measures.

We certify the Attorney General's certified Question for Elections Division #13 and shall certify the same Question for #17. We shall certify the same Question for Elections Division #21, with one small change, the deletion of the word "desires," which does not appear in the text of the measure of Elections Division #21.

Elections Division #25 is different. It contains only two major operative provisions, the "minority status" provision and the limitations placed on that provision. It does not contain a public spending provision. To prevent voter confusion, the Question must differ from the other Questions. With slight modification, the Question certified by the Attorney General meets the requirements of ORS 250.035(2). We certify the following Questions for each of the measures:

Elections Division #13 and #17: "Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; bar spending public funds in way approving homosexuality?"

Elections Division #21: "Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors; bar spending public funds in way approving homosexuality?"

Elections Division #25: "Shall state constitution bar laws defining a class of people for granting civil rights based on sexual behavior or desires?"

3. *Summary*. Set out below is a statement of each of the Summaries and a description of the pertinent rulings on the parties' challenges to those Summaries.

### a. *Elections Division #13*:

"Amends state constitution. Forbids basing civil rights on homosexuality, other sexual behavior or desires. Government cannot:

"— teach or advise children, students, employees that sexual behavior or desires equate legally or socially to existing civil rights classifications;

"— recognize marital status, or grant spousal benefits based on homosexuality;

"— spend public funds in way expressing approval of homosexuality.

"Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Bans pro-homosexuality books from public libraries unless books meet established local community standards."

We concluded that the Summary had to mention the limits imposed by the measure on its scope and also that the public library sentence required revision to summarize the provision of the measure in the terms of the measure. 322 Or at 42.

### b. *Elections Division #17*:

"Amends state constitution. Forbids laws that guarantee equal treatment for homosexual persons. Government cannot:

"— teach or advise children, students, or employees that sexual behavior or desires equate legally or socially to race, religion, or gender;

"— recognize marital status or grant spousal benefits based on homosexuality;

"— spend public funds in way expressing approval of homosexuality.

"Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Bans pro-homosexuality books from public libraries unless books meet established local community standards."

As with the Summary for Elections Division #13, we have concluded that the Summary must mention the limits imposed by the measure on its scope and also that the public library sentence requires revision to summarize the provision of the measure in the terms of the measure. We also have concluded that the Summary should be revised to correct for the rhetoric of the second sentence. *Mabon v. Kulongoski (Elections Division #17)*, 322 Or at 74-75.

#### c. *Elections Division #21*:

"Amends state constitution. Provides that moral objection to homosexuality is 'right of conscience,' not discrimination relating to civil rights. Bans spending public funds in way expressing approval of homosexuality. Forbids government from recognizing marital status or awarding spousal benefits on basis of homosexuality. Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Bars access by minors to pro-homosexuality public library books or literature without parent's supervision. Governments nonetheless cannot deny licenses, services, benefits due under existing statutes."

We have rejected Rooney's challenge to the Summary; Mabon posed no challenge. Accordingly, the Attorney General's certified Summary was deemed to be in substantial compliance with the statutory requirements. *Rooney v. Kulongoski (Elections Division #21)*, 322 Or at 87-88.

#### d. *Elections Division #25*:

"This measure would amend the state constitution. Current laws protect people from denial of housing, employment and other rights on the basis of race, religion, gender, or national origin. The measure would bar laws that protect people from denial of such rights based on their sexual behavior or desires. The measure also would say that governments nonetheless could not deny constitutional rights, or licenses, permits, services, or benefits due under existing statutes."

We have concluded that the use of the term "protect" can be emotionally charged and is not necessary to convey a major effect of the measure. We also have concluded that, in an 85-word Summary, some express mention of the measure's specific effect on homosexual persons was necessary. *Rooney v. Kulongoski (Elections Division #25)*, 322 Or at 99.

 As we have done in the context of the Captions and the Questions, we will certify the same Summary for Elections Division #13 and #17. The Attorney General's certified Summaries already share text that is similar or identical, and the two Summaries also share the same problems — the need to recognize the measure's limits and to revise the public library sentence. The one additional problem posed by the Summary for Elections Division #17 — the rhetoric of the phrase, "Forbids laws that guarantee equal treatment for homosexual persons" — is fixed by the Summary for Elections Division #13 ("Forbids basing civil rights on homosexuality").

Elections Division #21 does not include certain of the provisions of Elections Division #13 and #17. In addition, unlike with Elections Division #13 and #17, the Attorney General's certified Summary for Elections Division #21 does substantially comply with the statutory requirements, without need for revision. Because the Summary is the most specific descriptor of the ballot title sections for the measures, and because the underlying similarity among Elections Division #13, #17, and #21 already has been made clear to the voters by certification of the same Caption and nearly the same Question for each of those measures, we conclude that the Summary for Elections Division #21 does not need to be the same or nearly the same as the Summary for Elections Division #13 and #17 in order to prevent voter confusion. Accordingly, we can certify a different Summary for Elections Division #21 than the one that we certify for Elections Division #13 and #17. Because the Attorney General's certified Summary for Elections Division #21 does substantially comply with the statutory requirements, we will certify that Summary.

As we have noted in the context of our discussion of the Questions, Elections Division #25 is different. It warranted a different Caption and Question from the other three measures, and it warrants a different Summary. It is necessary to certify a different Summary for Elections Division #25 to avoid voter confusion and permit recognition of the different range of the measure. Accordingly, we will certify a Summary for that measure that takes into account the parties' valid objections to the Attorney General's certified Summary, necessary to bring the Summary into substantial compliance with the requirements of ORS 250.035(1)(c).

We certify the following Summaries for each of the measures:

Elections Division #13 and #17: We have set out below a version of the Summary that uses the Attorney General's certified Summary for Elections Division #13 as a baseline, showing this court's changes by indicating deletions in brackets and additions with italics:

"Amends state constitution. [Forbids basing civil rights on homosexuality, other sexual behavior or desires.] Government cannot:

"— *base civil rights on homosexuality, sexual behavior or desires;*

"— *deny other constitutional rights, or licenses, benefits, services under existing statutes;*

"— *tell* [teach or advise] children, students, employees that sexual behavior, [or] desires equate [legally or socially] to [existing civil rights] classifications *like race, religion, gender;*[15]

"— recognize *homosexual marital status,* [or grant] spousal benefits [based on homosexuality];

"— spend public funds *approving* [in way expressing approval of] homosexuality.

"Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of

---

[15] Both proposed measures refer to classifications like race, religion, and gender. The Attorney General's certified Summary for Elections Division #17 refers to "race, religion, or gender" in this place in the Summary, and we conclude that it is a somewhat more accessible description than the one used by the Attorney General's certified Summary for Elections Division #13 in the same place.

homosexuality. *Public libraries: Pro-homosexuality books available to minors with parental supervision, must meet local standards per review process.* [Bans pro-homosexuality books from public libraries unless books meet established local community standards.]"

The final version of the Summary certified by this court for Elections Division #13 and #17 is as follows:

"Amends state constitution. Government cannot:

"— base civil rights on homosexuality, sexual behavior or desires;

"— deny other constitutional rights, or licenses, benefits, services under existing statutes;

"— tell children, students, employees that sexual behavior, desires equate to classifications like race, religion, gender;

"— recognize homosexual marital status, spousal benefits;

"— spend public funds approving homosexuality.

"Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Public libraries: Pro-homosexuality books available to minors with parental supervision, must meet local standards per review process."

Elections Division #21: We certify the Attorney General's Summary.

Elections Division #25: We have set out below a version of the Summary that uses the Attorney General's certified Summary for Elections Division #25 as a baseline, showing this court's changes by indicating deletions in brackets and additions with italics:

"This measure would amend the state constitution. Current laws *base civil rights on classifications like race, religion, gender, and national origin in areas such as* [protect people from denial of] housing[,] *and* employment [and other rights on the basis of race, religion, gender, or national origin]. The measure would bar [laws that] *the inclusion of homosexuality, other sexual behavior or desires, in such civil rights laws* [protect people from denial of such rights based on their sexual behavior or desires]. The measure also would say that governments nonetheless could not deny constitutional

rights, or licenses, permits, services, or benefits due under existing statutes."

The final version of the Summary certified by this court in Elections Division #25 is as follows:

"This measure would amend the state constitution. Current laws base civil rights on classifications like race, religion, gender, and national origin in areas such as housing and employment. The measure would bar the inclusion of homosexuality, other sexual behavior or desires, in such civil rights laws. The measure also would say that governments nonetheless could not deny constitutional rights, or licenses, permits, services, or benefits due under existing statutes."

## CONCLUSION

For Elections Division #13, the measure at issue in this case, we certify the following ballot title:

### AMENDS CONSTITUTION: RESTRICTS LOCAL, STATE GOVERNMENT POWERS CONCERNING HOMOSEXUALITY

QUESTION: Shall constitution forbid basing civil rights on homosexuality, other sexual behaviors, desires; bar spending public funds in way approving homosexuality?

SUMMARY: Amends state constitution. Government cannot:

— base civil rights on homosexuality, sexual behavior or desires;

— deny other constitutional rights, or licenses, benefits, services under existing statutes;

— tell children, students, employees that sexual behavior, desires equate to classifications like race, religion, gender;

— recognize homosexual marital status, spousal benefits;

— spend public funds approving homosexuality.

Public employees' private lawful sexual behavior treated as non-job related unless that treatment expresses approval of homosexuality. Public libraries:

Pro-homosexuality books available to minors with parental supervision, must meet local standards per review process.

Ballot title certified as modified. This decision shall become effective in accordance with ORAP 11.30(9).

**UNIS, J.,** dissenting.

The majority holds that the ballot title for the proposed initiative measure at issue in this case does not comply substantially with the standards for ballot titles set forth in ORS 250.035(1) (1993).[1] Therefore, in accordance with its statutory duty, ORS 250.085(5) (1993),[2] the majority drafts and certifies a ballot title different than the title prepared by the Attorney General. In so doing, the majority concludes that the performance of that statutory duty — the drafting and certification of a different ballot title — does not violate the separation of powers principle embodied in Article III, section 1, of the Oregon Constitution. Because I conclude that, insofar as ORS 250.085(5) (1993) directs this court, if a ballot title prepared by the Attorney General does not comply substantially with statutory standards, to draft and certify a different ballot title that does meet those standards, that statute offends the separation of powers principle embodied in Article III, section 1, of the Oregon Constitution. I, therefore, respectfully dissent.[3]

The Oregon Constitution is the source of power for each branch of the Oregon government. Article IV, section 1(1), of the Oregon Constitution provides:

---

[1] The 1995 Oregon Legislative Assembly made significant amendments to ORS 250.035 (1993). Or Laws 1995, ch 534, § 1. Those changes, however, do not apply to the ballot title in this case. *See* Or Laws 1995, ch 534, § 20 (provisions of act apply to initiative and referendum petitions for which a prospective petition is filed on or after effective date of act). Because the prospective petition in this case was filed before the effective date of the act, July 7, 1995, the earlier version of the law applies.

[2] The 1995 Oregon Legislative Assembly made less significant changes to ORS 250.085 (1993). Or Laws 1995, ch 534, § 2. These changes also do not apply to the ballot title in this case. Or Laws 1995, ch 534, § 20.

[3] Because the majority reviews the Attorney General's certified ballot title *and* drafts and certifies a ballot title different than the one certified by the Attorney General, I do not address the question whether judicial review of a ballot title under ORS 250.085(5) (1993), unaccompanied by certification of a different ballot title by this court, violates the separation of powers principle embodied in Article III, section 1, of the Oregon Constitution.

"The legislative power of the state, except for the initiative and referendum powers reserved to the people, is vested in a Legislative Assembly, consisting of a Senate and a House of Representatives."

Article IV, sections 1(2)(a) and 1(3)(a), reserve to the people the initiative and referendum powers, respectively.

Article VII (Amended), section 1, provides in part:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

Additionally, Article III, section 1, provides:

"The powers of the Government shall be divided into three seperate (*sic*) departments, the Legislative, the Executive, including the administrative, and the Judicial; and *no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided.*" (Emphasis added.)

The Oregon Constitution compels the separation of powers among the branches of government[4] in two ways. First, the Oregon Constitution affirmatively assigns separate powers to each branch of government. Second, an additional section expressly forbids an officer of one branch of government from exercising the distinct functions of another branch unless the Oregon Constitution otherwise *expressly* provides. Therefore, without such express constitutional authority, a statute that requires the Judicial Branch to exercise legislative functions is invalid. *See City of Enterprise v. State*, 156 Or 623, 69 P2d 953 (1937) (statute that, among other things, vested court with power to levy taxes, fix salaries of municipal officers, and effect municipal contracts violated Article III, section 1, of the Oregon Constitution).

The Oregon Supreme Court may not act legislatively or encroach on the functions of another branch of government merely because strong policy considerations favor the exercise of extra-judicial functions. "Our task * * * in construing a constitutional provision is to respect the principles given the status of constitutional guarantees and limitations

---

[4] Although Article III, section 1, of the Oregon Constitution uses the term "departments," in this opinion, I use the more common term "branch" or "branches."

by the drafters; it is not to abandon these principles when this fits the needs of the moment." *State v. Kessler*, 289 Or 359, 362, 614 P2d 94 (1980).

As Justice Linde, formerly of this court, observed in regard to the federal constitution:

> "The Constitution directs governments how to act and how not to act. The Constitution does not say that a government may act contrary to those directives if judges believe that the government has good enough reasons to do so." Hans Linde, *Who Must Know What, When, and How: The Systemic Incoherence of "Interest" Scrutiny*, in Public Values in Constitutional Law 219, 219 (Stephen E. Gottlieb ed., 1993).

That principle applies equally to the Oregon Constitution. The Oregon Supreme Court may not draft and certify a ballot title different from the one certified by the Attorney General merely because the Legislative Branch directs this court to do so, or because this court believes that it plays an important part in the initiative and referendum process when it does so.

I begin my analysis by reviewing the process by which a ballot title reaches this court for certification. After a prospective petition for an initiative measure is submitted to the Secretary of State, the Secretary of State sends copies of the proposed initiative measure to the Attorney General. ORS 250.065(2). The Attorney General then prepares a draft ballot title for the proposed initiative. ORS 250.065(3).

ORS 250.035(1) (1993) mandated three components for a ballot title: (1) a Caption that reasonably identifies the measure's subject; (2) a Question that plainly phrases the measure's chief purpose; and (3) a concise and impartial Summary that summarizes the measure and its major effect. *Nelson v. Roberts*, 309 Or 499, 502, 789 P2d 650 (1990).[5] Additionally, ORS 250.035(2) (1993) mandated that the ballot title "not resemble, so far as probably to create confusion, any title previously filed for a measure to be submitted at that election." After the Attorney General prepares a ballot title, the public may submit written comments concerning that

---

[5] *Former* ORS 250.039 also required that a ballot title for a proposed initiative measure meet minimum readability standards designated by the Secretary of State. *Former* ORS 250.039 was repealed by the 1995 Legislative Assembly. Or Laws 1995, ch 534, § 19. That Act does not apply to the ballot title in this case. *Id.* at § 20.

title during the comment period. ORS 250.067(1). If an elector — a person qualified to vote under Article II, section 2, of the Oregon Constitution[6] — timely submits written comments during the comment period, the elector, if dissatisfied with the ballot title certified by the Attorney General, may petition this court to "seek[] a different title." ORS 250.005(2); ORS 250.085(2) (1993).[7]

Under the statutory scheme relevant to the ballot title at issue in this case, the Legislative Assembly gives this court two primary responsibilities when we receive a petition that seeks a different ballot title. If this court, on review, determines that the ballot title for a proposed initiative measure certified to the Secretary of State by the Attorney General complies substantially with the statutory standards set forth in ORS 250.035(1) and (2) (1993), ORS 250.085(5) (1993)[8] directs this court to approve and certify that ballot title to the Secretary of State. If, however, this court determines that the ballot title certified to the Secretary of State by the Attorney General for a proposed initiative measure does not comply substantially with those statutory standards, ORS 250.085(5) (1993) directs this court to draft and certify a ballot title that does meet those statutory requirements. It is the nature of the act of drafting and certifying a different ballot title that raises separation of powers concerns.

This court's act of drafting and certifying a ballot title different than the one prepared by the Attorney General is legislative in nature, because it entangles the court in the enactment of direct legislation. The enactment of direct legislation through a ballot measure is a function of the Legislative Branch of government:

"By the adoption of the initiative and referendum into our constitution, the legislative department of the State is

---

[6] Only an elector is entitled to petition for this court's review of a ballot title for a state measure. *Brown v. Roberts*, 309 Or 667, 669, 791 P2d 488 (1990).

[7] With a limited exception, the elector may raise in front of this court only those arguments that were presented in writing to the Secretary of State during the comment period. ORS 250.085(6) (1993).

[8] ORS 250.085(5) (1993) provides:

"The court shall review the title for substantial compliance with the requirements of ORS 250.035 and 250.039, and shall certify a title meeting this standard to the Secretary of State."

divided into two separate and distinct law-making bodies. There remains, however, as formerly, but one legislative department of the State. It operates, it is true, differently than before — one method by the enactment of laws directly, through that source of all legislative power, the people; and the other, as formerly, by their representatives[.]" *Straw v. Harris*, 54 Or 424, 430-31, 103 P 777 (1909).

*See also* Article IV, section 1, of the Oregon Constitution (the people exercise a legislative function through the initiative and referendum processes).

Under the statute, the drafting of the ballot title is an important necessary step in the enactment of any initiative measure. It is the ballot title, not the full text of the measure itself, that voters have before them when casting their votes. *See* ORS 254.145 (setting forth the design and contents of official ballots). The wording of the ballot title greatly influences the success or failure of a particular measure. Moreover, the ballot title becomes part of the legislative history that courts utilize in interpreting measures that are approved by the voters. *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560 n 8, 871 P2d 106 (1994).

Thus, when this court drafts and certifies a ballot title for a proposed initiative measure that is different than the ballot title certified by the Attorney General, it performs a crucial preliminary step in the legislative process. As this court has recognized in the past,

"the writing of ballot titles is not a judicial but a legislative or political function. Normally, appeals may be taken only from judicial bodies, and, generally, the doctrine of the separation of powers prohibits courts from infringing upon legislative functions.

"The preparation of a ballot title, like the writing of a title for a legislative bill, requires construction and interpretation of the measure itself. The purpose of a ballot title is to guide and inform the voters in a future election. A court which writes a ballot title for an initiative measure knows that the title which it is writing will be printed upon the ballot if enough signatures are procured for the measure, and may be accepted by the signers and voters as an index to the meaning of the measure. Should the measure become involved in political discussion, the ballot title may be invoked by partisans to settle some of the debates. Thus, in a measure, the

court which wrote the title would find itself drawn into the controversy as counsel by the side served by the title. If the measure is adopted at the election and if it later becomes the subject of judicial controversy involving its true interpretation, the court may find that either the appellant or the respondent will wish to contest the interpretation manifested in the ballot title which the court wrote." *Richardson v. Neuner*, 183 Or 558, 562-63, 194 P2d 989 (1948).[9]

The drafting of the ballot title is akin to the writing of a title for a legislative bill. Preliminary steps of the legislative process, such as the drafting of titles for legislative bills, or the drafting of ballot titles, are internal processes committed exclusively to the other branches of government. The judiciary should play no role in those legislative functions in the absence of express constitutional authorization. By requiring this court to draft and certify a ballot title to the Secretary of State that is different than the ballot title certified by the Attorney General, the pertinent statutory scheme makes this court an active participant in the legislative process.

The exercise of such a political or legislative function by this court unduly entangles this court in the internal workings of a separate branch of government. The statutory scheme that directs the Judicial Branch to revise ballot titles vests in the Judicial Branch the power to influence the passage or failure of legislative proposals.[10] In my view, vesting such power in the judiciary violates Article III, section 1, of the Oregon Constitution.

---

[9] In *Richardson v. Neuner*, 183 Or 558, 562-63, 194 P2d 989 (1948), this court nevertheless concluded that, when the Attorney General drafts a ballot title, the Attorney General acts in a quasi-judicial capacity. In my view, that conclusion was erroneous and cannot be justified in view of the court's correct discussion concerning how the drafting of ballot titles is a legislative or executive function. *See Dagwell et al v. Thornton et al*, 199 Or 8, 12-16, 259 P2d 125 (1953) (Warner, J., dissenting) (criticizing *Richardson* and concluding that judicial review of ballot titles violates Article III, section 1).

[10] In no way do I mean to suggest that we who now are on this court, or members of this court at any time, have attempted to influence the passage or failure of legislative proposals through manipulation of ballot titles. Rather, as this court has stated in the past:

"Our concern [regarding separation of powers violations] is not with what has been done but rather with what might be done, directly or indirectly, if one person is permitted to serve two different departments at the same time. The constitutional prohibition is designed to avoid the opportunities for abuse arising out of such dual service whether it exists or not." *Monaghan v. School District No. 1*, 211 Or 360, 376, 315 P2d 797 (1957).

It is true, as the majority notes, that under Article III, section 1, an officer of one branch may exercise the functions of another if the Oregon Constitution "expressly provides." Nowhere in the Oregon Constitution, however, is there an *express* grant to the Judicial Branch to perform the legislative function of drafting and certifying a ballot title for a proposed initiative measure.

The majority finds an express grant in Article IV, section 1(4)(b), which provides:

"Initiative and referendum measures shall be submitted to the people as provided in this section *and by law not inconsistent therewith.*" (Emphasis added.)

That section authorizes the Legislative Assembly to adopt laws concerning the submission of initiative and referendum measures as long as they are not inconsistent with other constitutional provisions. Article IV, section 1(4)(b), however, does not *expressly* give the Legislative Assembly the power to involve the Judicial Branch in the legislative process. The phrase "and by law not inconsistent therewith" is not an express grant of power to the Legislative Assembly to compel officers of the Judicial Branch to carry out a function that, without question, is legislative in character.

By contrast, there are several examples in which the Oregon Constitution does expressly grant one branch of government the power to perform the functions of another. For example, Article IV, section 1(4)(a), provides in part:

"Petitions or orders for the initiative or referendum shall be filed with the Secretary of State. The Legislative Assembly shall provide by law for the manner in which the Secretary of State shall determine whether a petition contains the required number of signatures of qualified voters."

That section expressly gives one branch of government, the Executive, the power to administer part of the legislative process, the filing of petitions or orders for initiatives and referendums.

Another example in which the Oregon Constitution expressly grants one branch of government the power to perform the functions of another exists in Article XV, section 8:

"Notwithstanding the provisions of section 1 article III and section 10 article II of the Constitution of the State of Oregon, a person employed by the State Board of Higher Education, a member of any school board or employee thereof, shall be eligible to a seat in the Legislative Assembly and such membership in the Legislative Assembly shall not prevent such person from being employed by the State Board of Higher Education or from being a member or employee of a school board."

Before the amendment of Article XV, section 8, of the Oregon Constitution, this court had held that a person who was a member of the Legislative Assembly could not teach in a public school because of the Article III, section 1, principle of separation of powers. *Monaghan v. School District No. 1*, 211 Or 360, 315 P2d 797 (1957).

In *Monaghan*, this court construed Article III, section 1, strictly to prohibit any mixing of legislative and executive functions. Indeed, the *Monaghan* court noted that this was a construction of "extreme precaution"; however, it believed that

"[this construction] expresses the considered judgment and deliberation of the Oregon Convention to give greater force to the concepts of separation by thus barring any official in one department of government of the opportunity to serve any other department, even as an employee." *Id.* at 370.

Similarly, in *In the Matter of Sawyer*, 286 Or 369, 384, 594 P2d 805 (1979), this court held that Article III, section 1, of the Oregon Constitution prohibits a judge from engaging in employment as a regular part-time teacher for compensation at a state-funded college (a function of the Executive Branch).

Article III, section 1, therefore, is not merely an affirmative allocation of powers to the separate branches; it is stated also as a negation: "no person charged with official duties under one of these departments[] shall exercise any of the functions of another[.]" Or Const, Art III, § 1. Following *Monaghan*, to create an exception to the strict limitations of Article III, section 1, the Oregon Constitution was amended. The amendment, Article XV, section 8, expressly granted one part of the Executive Branch, employees of the State Board of Higher Education and of any school board, the power to exercise the functions of another, the Legislative Assembly.

The express grant evident in Article XV, section 8, is in contrast to the language of Article IV, section 1(4)(b), which makes no provision for the sharing of power between separate governmental branches. Although Article IV, section 1(4)(b), gives the legislature broad powers to make laws consistent with the people's right to vote on initiative and referendum measures, it does not expressly grant the Judicial Branch the power to draft and certify ballot titles for proposed initiative measures.

The majority also relies on *In re Ballot Title*, 247 Or 488, 431 P2d 1 (1967), to support its conclusion that judicial drafting and certification of ballot titles different than those prepared by the Attorney General does not violate the separation of powers. The majority's reliance on that case is misplaced. That case supports my view, not the majority's. In *In re Ballot Title*, this court held unconstitutional a statute that required this court to review ballot titles prepared by the Attorney General, regardless of whether a challenge was brought by a particular party, and to certify a substitute title if the Attorney General's ballot title was not sufficient. *Id.* at 491-92. The court said that the statute attempted "to require the court to render a nonjudicial advisory opinion," *id.*, and that "the present statute seeks to have the court perform a non-judicial function, contrary to the prohibition of [Article] III, [section] 1." *Id.* at 495.

The majority attempts to distinguish *In Re Ballot Title* by arguing that "the current statutory scheme has none of the same infirmities" as the statute held unconstitutional in that case. I disagree. Although ORS 250.085(5) (1993) creates the trappings of administrative adjudication for the process of judicial review of a ballot title, its requirement that this court compose a different ballot title if the Attorney General's ballot title is deemed insufficient is identical to the requirement held unconstitutional in *In Re Ballot Title*. The *function* of creation of a new ballot title is not transformed from its legislative character by the addition of adjudicative procedures to the ballot title review process. The majority's attempt to distinguish *In Re Ballot Title* on that basis is unavailing.

The view expressed in Justice McAllister's concurring opinion in *In re Ballot Title* is correct:

"The preparation of a ballot title * * * is either a legislative or an executive function. The drafting of a ballot title by this court would be the exercise by the judicial department of a function of another department of government. This court is prohibited by the express language of the constitution from exercising a legislative or executive function and the same language prohibits the legislature from imposing a legislative or executive function upon the court. I prefer to rest our decision on the separation of powers doctrine and therefore concur in the result of the majority opinion." *Id.* at 496 (McAllister, J., concurring).

Recognizing the gravity of even limited intrusions by one branch of government into the functions of another, this court in *Monaghan* concluded its opinion "with the words of Madison, taken from 1 The Federalist, p 340":

" 'It is equally evident that, in reference to each other, neither of them ought to possess, *directly or indirectly*, an overruling influence in the administration of their respective powers. It will not be denied that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.' (Emphasis supplied.)" *Monaghan*, 211 Or at 377.

In summary, I believe that, to the extent that ORS 250.085(5) (1993) directs this court to draft and certify a ballot title for a proposed initiative measure that is different than the ballot title prepared by the Attorney General, it requires this court to engage in a legislative function and makes this court an active participant in the legislative process. In my view, the involvement of this court in the legislative process, by drafting and certifying a ballot title for a proposed initiative measure, violates the separation of powers guaranteed by Article III, section 1, of the Oregon Constitution. I would, therefore, dismiss this case for lack of jurisdiction. Accordingly, I respectfully dissent.

Durham, J., joins in this dissenting opinion.