Argued and submitted August 24, ballot measure explanatory statement certified September 8, 2000

Jay DUDLEY
and Jim Hill,
*Petitioners,*

*v.*

Bob JENKS,
Daniel Meek and Charles Davis,
in their capacities as members of
the Citizens Committee
appointed pursuant to ORS 251.205(1),
*Respondents.*

(SC S47797)

10 P3d 257

John A. DiLorenzo, Jr., Portland, argued the cause for petitioners. With him on the petition were Aaron K. Stuckey and Hagen, Dye, Hirschy & DiLorenzo, P.C.

Daniel Meek, Portland, argued the cause and filed the answering memorandum for respondents.

GILLETTE, J.

## GILLETTE, J.

In this original proceeding, petitioners challenge the explanatory statement for Ballot Measure 90 (2000). *See* ORS 251.205 (providing for creation and manner of selection of committee of five citizens to prepare explanatory statement for initiated and referred measures); ORS 251.215 (providing for preparation and filing of explanatory statement by committee). The measure, which was passed by the legislature and referred by the people, would amend present statutory law relating to the ability of public utility and telecommunications companies to obtain a return of and a return on property that has been retired from service.

■        After a majority of the explanatory statement committee prepared and filed an explanatory statement for the measure, ORS 251.215(1), the Secretary of State held a hearing to receive comments on the statement. Following the hearing, the committee majority filed a revised explanatory statement with the Secretary of State. ORS 251.215(2), (3). Petitioners[1] offered suggestions for changes to the explanatory statement at that hearing; they are entitled to seek a different explanatory statement in this court. ORS 251.235; *see also Homuth v. Keisling*, 314 Or 214, 218-19, 837 P2d 532 (1992) (ORS 251.235 authorizes Supreme Court review of explanatory statement when any suggestions were offered at Secretary of State's hearing).

---

[1] Petitioners were themselves members of the citizens' committee that was appointed under ORS 251.205 to prepare the explanatory statement at issue here. Petitioners declined to join the majority of the citizens' committee in certifying that explanatory statement. Respondents have moved to dismiss the present petition to review explanatory statement on the ground that the caption used by petitioners fails to set out the fact that petitioners themselves were members of the citizens' committee. Respondents rely on ORAP 11.32(2)(a), which provides:

"The citizens committee appointed to prepare the explanatory statement shall be designated 'Respondents,' the Attorney General shall not be designated as a respondent, and the title of the proceeding shall be 'Petition to Review Explanatory Statement'."

Petitioners argue that it would be absurd to name themselves as additional respondents, in view of the fact that it is they who are challenging the explanatory measure. We think that it is sufficient to state that failure to comply precisely with the requirements of ORAP 11.32(2)(a) is not jurisdictional. Respondents' motion to dismiss this proceeding is denied.

■     The committee is directed by statute to prepare an explanatory statement that is an "impartial, simple and understandable statement explaining the measure." ORS 251.215(1). This court's task is to determine whether the explanatory statement contains a sufficient and clear statement explaining the measure. *See Sizemore v. Myers*, 327 Or 456, 459, 964 P2d 255 (1998) (so stating); ORS 251.235 (authorizing court to consider challenges to explanatory statement on grounds that statement is "insufficient or unclear").

■     Petitioners who challenge an explanatory statement bear the burden of demonstrating that the statement is insufficient or unclear. *June v. Roberts*, 310 Or 244, 248, 797 P2d 357 (1990). That burden is a significant one. This court has stated:

> "The statutes call for the committee to be composed of two proponents of the measure, two opponents of the measure, and a fifth member chosen by the other four (presumably a tie-breaker). *See* ORS 251.205. The scheme brings the opposing political forces to bear in the development of a statement, on the implicit assumption that this will result in an acceptably politically balanced statement for the voters. * * *
>
> "The explanatory statement procedures thus differ markedly from the procedures devised for providing a ballot title. *See* ORS chapter 250. The legislature has provided for a process by which opposing viewpoints are brought to bear on the statement's drafting, and has provided for a hearing process to allow other interested people to participate. By design, the process is both legislative and political. *The court, in its review, should defer to those processes unless the inadequacy of the statement is clear. In reviewing the explanatory statement, the court should not invalidate or modify it unless its insufficiency is beyond reasonable argument.*"

*Teledyne Wah Chang Albany v. Powell*, 301 Or 590, 592-93, 724 P2d 319 (1986) (emphasis supplied). With the foregoing standards in mind, we turn to the referred measure and its explanatory statement that are before us in this case.

For the convenience of the reader, we here set out both the referred measure and the explanatory statement

respecting the measure that was prepared by a majority of the citizens' committee appointed to perform that task. The referred measure provides:

"**Be It Enacted by the People of the State of Oregon:**

"*SECTION 1.* ORS 757.140 is amended to read:

"757.140. (1) Every public utility shall carry a proper and adequate depreciation account. The Public Utility Commission shall ascertain and determine the proper and adequate rates of depreciation of the several classes of property of each public utility. The rates shall be such as will provide the amounts required over and above the expenses of maintenance, to keep such property in a state of efficiency corresponding to the progress of the industry. Each public utility shall conform its depreciation accounts to the rates so ascertained and determined by the commission. The commission may make changes in such rates of depreciation from time to time as the commission may find to be necessary.

"(2)  **Notwithstanding ORS 757.355,** in the following cases the commission may allow in rates, directly or indirectly, **the return of and a return on** amounts on the utility's books of account which the commission finds represent undepreciated investment in [*a*] utility [*plant, including that which*] **property that** has been retired from service:

"(a)   When the retirement is due to ordinary wear and tear, casualties, acts of God, acts of governmental authority; or

"(b)   When the commission finds that the retirement is in the public interest.

"*SECTION 2.* ORS 759.135 is amended to read:

"759.135. (1) Every telecommunications utility shall carry a proper and adequate depreciation account. The Public Utility Commission shall ascertain and determine the proper and adequate rates of depreciation of the several classes of property of each telecommunications utility. The rates shall be such as will provide the amounts required over and above the expenses of maintenance, to keep such property in a state of efficiency corresponding to the progress of the industry. Each telecommunications utility shall

conform its depreciation accounts to the rates so ascertained and determined by the commission. The commission may make changes in such rates of depreciation from time to time as the commission may find to be necessary.

"(2)   **Notwithstanding ORS 757.355,** in the following cases the commission may allow in rates, directly or indirectly, **the return of and a return on** amounts on the utility's books of account which the commission finds represent undepreciated investment in [a] utility [plant, including that which] **property that** has been retired from service:

"(a)   When the retirement is due to ordinary wear and tear, casualties, acts of God, acts of governmental authority; or

"(b)   When the commission finds that the retirement is in the public interest.

"*SECTION 3.* The amendments to ORS 757.140 and 759.135 by sections 1 and 2 of this 1999 Act apply to public utility and telecommunications utility property retired from service before, on or after the effective date of this 1999 Act.

"*SECTION 4.* The amendments to ORS 757.140 and 759.135 by section 1 and 2 of this 1999 Act apply to orders of the Public Utility Commission entered before, on or after the effective date of this 1999 Act."

(Boldface denotes new material; bracketed and italicized material is deleted.)

The majority of the citizens' committee certified the following explanatory statement for the referred measure:

"Measure 90 would change Oregon law to allow regulated utilities (electric, phone, gas, water) to charge rates high enough to give the utilities profits on 'retired' plants and property no longer providing service, including plants that have stopped working. The Measure is retroactive and would allow rates giving utilities profits on the Trojan nuclear plant, which shut down permanently in 1992.

"Measure 90 would have these effects:

"1.   It would reinstate a 1995 order of the Oregon Public Utilities Commission (Commission) giving Portland General Electric Co. (PGE) profits on the closed Trojan nuclear plant by allowing PGE to charge ratepayers

approximately $304 million for 'return on investment' or profit on Trojan.

"2.   It would nullify the decision of the Oregon Court of Appeals that present law (enacted by voters by initiative in 1978) prohibits utilities from charging rates giving them profits for retired plants, including Trojan.

"3.   It would allow utilities to charge rates high enough to receive, at the same time, profits on retired plants and also profits on the plants the utilities build to replace them.

"Measure 90 would apply to all public utilities regulated by the Oregon Commission.

"Measure 90 seeks to bypass, as to retired plants, the existing statute, enacted by Oregon voters in 1978, which states:

"No public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer.

"Measure 90, however, would authorize the Oregon Commission to allow utilities to receive profits on plants, including those which have stopped working or are otherwise retired before the end of their expected lives.

"Measure 90 is retroactive and would apply to all utility plants and property retired in the past. The Trojan nuclear plant was permanently closed in 1992, 19 years before the end of its expected life. In 1995, the Oregon Commission allowed PGE to charge ratepayers approximately $304 million to give PGE stockholders a 'return on investment' or profit on Trojan. (This assumes no future change to the rate of return the Oregon Commission approved for PGE.)

"By the end of 1999, PGE ratepayers had paid approximately $150 million to PGE for Trojan profits.

"In 1998, the Oregon Court of Appeals reversed the 1995 Oregon Commission order, concluding that present law (the 1978 ballot measure) prohibits utilities from charging rates to receive profits on plants not providing service, including Trojan. While the Oregon Supreme Court was reviewing

this decision, the 1999 Oregon Legislature passed HB 3220. PGE then asked the Supreme Court to reverse the earlier Court decision, on the basis of HB 3220. Oregon citizens then submitted 53,489 valid signatures to subject HB 3220 to a statewide referendum. Measure 90 is the referendum on HB 3220. Measure 90 is not an initiative."

As noted, the issue is whether the explanatory statement is insufficient or unclear in that it fails to explain the measure in a way that is "impartial, simple and understandable." ORS 251.215(1). Petitioners argue that the explanatory statement is insufficient or unclear in several respects. We turn to those arguments.

■■ Petitioners argue, first, that the explanatory statement as a whole is "partial." Among other things, they contend that it is one-sided in that "[i]t does not include any reference to any statements that would lead a typical voter to even consider voting for the measure." An explanatory statement must be impartial and, if it is not, it is insufficient. *Sollis v. Hand*, 310 Or 251, 255, 796 P2d 1188 (1990); *Teledyne Wah Chang Albany*, 301 Or at 593.

Hyperbole aside, petitioners may be correct that the explanatory statement, when read as a whole, would not incline a voter to approve the referred measure. But that argument proves too much. As we have noted, the explanatory statement is a political statement that is intended to be the result of compromise. The statutes do not promise that any statement necessarily will cause a voter to be disposed favorably toward a measure; they promise only that a statement will not turn a voter against a measure unfairly. We have considered petitioners' overall challenge on the explanatory statement carefully but conclude that, in light of the deference that such statements are to receive, the statement cannot be condemned as wholly biased and unfair. If petitioners are to prevail, they must do so with respect to their more specific objections to the statement.

■ Petitioners next argue that the explanatory statement is fatally inaccurate when it states, at three different places, that the measure would "allow" utilities to charge rates high enough to receive, at the same time, profits on retired plants and also profits on the plants that the utilities

build to replace them. The measure would not "allow" utilities to do anything of their own volition, petitioners assert. Instead, it would permit the Public Utility Commission (PUC) to authorize such rates, if the PUC found it to be appropriate to do so. It may be that, when read in isolation, the several uses of the word "allow" in the explanatory statement could be misleading. But we do not believe that it is appropriate to read any phrase or sentence in an explanatory statement in isolation. In the present case, for example, the explanatory statement also contains three references to the PUC, all of which refer (one directly and the other two indirectly) to the fact that the rates at issue are ones that the PUC "allows" the utility to charge. When it is read in the context that we have described, the word "allow" does not convey the misimpression that petitioners assert. We find no insufficiency in this respect.

Petitioners next assert that the explanatory statement is insufficient, because it "makes no mention whatsoever of the Legislature's rationale for passing the bill [that became this referred measure]." We are not aware of any statutory provision that requires the committee specifically to identify and report on the legislature's rationale, assuming that there is a single rationale attributable to those who voted for the measure and further assuming that that motivation can be identified.

Petitioners next challenge the use throughout the explanatory statement of the term "profits" to describe the concept of "return on investment" that the measure is intended to allow to the regulated utilities. We find no violation of the statutory standard. We believe that the committee was well within its range of discretion in choosing to use a term that aptly would describe for many (if not most) persons the common understanding of what a utility receives when it obtains a return "on" an investment.

Finally, petitioners object to inclusion in the explanatory statement of statements that ratepayers have paid approximately $150 million to PGE for Trojan profits and will be charged another $304 million for a profit on Trojan if the measure is approved. Petitioners contend that those numbers are "speculative" and have "no basis whatsoever in

any record." The first objection is not supported by anything that would lead us to believe that the majority of the committee that drafted the explanatory statement was not entitled to believe that the figures were accurate. There are two problems with the second objection: First, there is no requirement that we are aware of, either in ORS 251.235 or elsewhere, that all statements in an explanatory statement be based on some kind of record. Second, respondents have included with their submissions materials that indicate that the figures in question were brought up repeatedly during the progress of the referred measure through the legislature and afterward. As noted, petitioners bear the burden of showing that the explanatory statement is insufficient or unclear. They have not met that burden in this respect.

We note one further argument advanced by petitioners, because it is pertinent to this court's continued consideration of challenges to explanatory statements under ORS chapter 251, as well as to consideration of challenges to ballot titles under ORS chapter 250. Petitioners argue that ORS 251.235,[2] which gives this court the authority to redraft and certify a new explanatory statement, is unconstitutional, because any duty to draft explanatory statements belongs to the Legislative Department.[3]

Petitioners' argument is a familiar one. Since 1995, various members of this court have declined to participate in the reformation of ballot titles and explanatory statements

---

[2] ORS 251.235 provides, in part:

"Any person dissatisfied with an explanatory statement * * * may petition the Supreme Court seeking a different statement and stating the reasons the statement filed with the court is insufficient or unclear. * * * [T]he court shall review the statement, hear arguments and certify an explanatory statement to the Secretary of State. The review by the Supreme Court shall be conducted expeditiously to insure the orderly and timely conduct of the election at which the measure is to be submitted to the electors. The statement certified by the court shall be the explanatory statement printed in the voters' pamphlet."

[3] In their brief, petitioners attempt to distinguish between redrafting ballot titles, which this court declared to be a constitutional exercise of this court's power in *Rooney v. Kulongoski*, 322 Or 15, 902 P2d 1143 (1995), and redrafting explanatory statements, which petitioners argue is unconstitutional for the same reasons stated in Justice Unis' dissent in *Rooney*. Because we do not now decide petitioners' constitutional argument, we need not reach the question whether redrafting ballot titles is distinguishable from redrafting explanatory statements for separation of powers purposes.

because they concluded that redrafting of that kind is beyond the court's constitutional power under Article III, section 1, of the Oregon Constitution.[4] *See Rooney v. Kulongoski*, 322 Or 15, 55, 902 P2d 1143 (1995) (Unis, J., dissenting, joined by Durham, J.) (rewriting ballot titles is legislative function); *Deras v. Myers*, 327 Or 472, 479, 962 P2d 692 (1998) (Durham, J., dissenting) (rewriting explanatory statements is legislative function); *see also Eisenzimmer v. Myers*, 330 Or 272, 275, 998 P2d 1272 (2000) (Riggs, J., concurring) (modifying a ballot title violates separation of powers); *Earls v. Meyers*, 330 Or 171, 178, 999 P2d 1134 (2000) (Van Hoomissen, J., dissenting, joined by Riggs, J.) (separation of powers issues in ballot title challenges should be revisited); *Novick v. Myers*, 330 Or 154, 159, 998 P2d 1258 (2000) (Leeson, J., concurring) (noting disagreement that this court can engage in interpretive exercise in ballot title challenges). However, despite those published comments by various past and present members of this court, this is the first time that the issue has been raised by a party in a challenge to an explanatory statement.

The principle of separation of powers is central to our system of government. Rulings respecting the scope of that principle can have sweeping consequences. Our ruling on the merits of petitioners' challenges to the explanatory statement in this case obviates any need to answer petitioners' separation of powers arguments now, but the issue is one that seems certain to arise again. We note it to alert potentially affected parties and with the expectation that, in that event, we shall have both the briefing that will permit the issue to be addressed in a structured way and the time to permit us to render a fully considered decision.

Petitioners have not carried their burden of establishing that the explanatory statement is insufficient or unclear. It follows that the statement should be certified to the Secretary of State without modification. We certify the

---

[1] Article III, section 1, of the Oregon Constitution, which requires a separation of powers among the three coordinate branches of government, provides:

"The powers of the Government shall be divided into three seperate (sic) departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

following explanatory statement for Ballot Measure 90 to the Secretary of State:

Measure 90 would change Oregon law to allow regulated utilities (electric, phone, gas, water) to charge rates high enough to give the utilities profits on "retired" plants and property no longer providing service, including plants that have stopped working. The Measure is retroactive and would allow rates giving utilities profits on the Trojan nuclear plant, which shut down permanently in 1992.

Measure 90 would have these effects:

1. It would reinstate a 1995 order of the Oregon Public Utilities Commission (Commission) giving Portland General Electric Co. (PGE) profits on the closed Trojan nuclear plant by allowing PGE to charge ratepayers approximately $304 million for "return on investment" or profit on Trojan.

2. It would nullify the decision of the Oregon Court of Appeals that present law (enacted by voters by initiative in 1978) prohibits utilities from charging rates giving them profits for retired plants, including Trojan.

3. It would allow utilities to charge rates high enough to receive, at the same time, profits on retired plants and also profits on the plants the utilities build to replace them.

Measure 90 would apply to all public utilities regulated by the Oregon Commission.

Measure 90 seeks to bypass, as to retired plants, the existing statute, enacted by Oregon voters in 1978, which states:

No public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer.

Measure 90, however, would authorize the Oregon Commission to allow utilities to receive profits on plants, including those which have stopped working or are otherwise retired before the end of their expected lives.

Measure 90 is retroactive and would apply to all utility plants and property retired in the past. The Trojan nuclear plant was permanently closed in 1992, 19 years before the end of its expected life. In 1995, the Oregon Commission allowed PGE to charge ratepayers approximately $304 million to give PGE stockholders a "return on investment" or profit on Trojan. (This assumes no future change to the rate of return the Oregon Commission approved for PGE.)

By the end of 1999, PGE ratepayers had paid approximately $150 million to PGE for Trojan profits.

In 1998, the Oregon Court of Appeals reversed the 1995 Oregon Commission order, concluding that present law (the 1978 ballot measure) prohibits utilities from charging rates to receive profits on plants not providing service, including Trojan. While the Oregon Supreme Court was reviewing this decision, the 1999 Oregon Legislature passed HB 3220. PGE then asked the Supreme Court to reverse the earlier Court decision, on the basis of HB 3220. Oregon citizens then submitted 53,489 valid signatures to subject HB 3220 to a statewide referendum. Measure 90 is the referendum on HB 3220. Measure 90 is not an initiative.

Ballot measure explanatory statement certified. Under ORAP 1.20(4), and notwithstanding ORAP 9.25(1) and ORAP 14.05, this opinion will become effective when the appellate judgment issues. The State Court Administrator shall issue the appellate judgment at 5:00 p.m. on September 11, 2000, unless a petition for reconsideration is both filed with and physically received by the Office of the State Court Administrator by that time. Any timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on such petition.