Argued and submitted January 31, 2018, Petition dismissed November 27, 2019

## CASCADIA WILDLANDS,
an Oregon non-profit corporation;
Center For Biological Diversity,
a California non-profit corporation;
and Oregon Wild,
an Oregon non-profit corporation,
*Petitioners,*

*v.*

## DEPARTMENT OF FISH AND WILDLIFE,
an agency of the State of Oregon;
and Fish and Wildlife Commission,
an agency of the State of Oregon,
*Respondents,*

*and*

## OREGON CATTLEMEN'S ASSOCIATION,
and Oregon Farm Bureau Federation,
*Intervenor-Respondents,*

*and*

## WALLOWA COUNTY,
a political subdivision of the State of Oregon,
*Intervenor-Respondent.*

### Department of Fish and Wildlife
A161077

455 P3d 950

Petitioners seek judicial review of an amendment to OAR 635-100-0125, in which respondent Oregon Fish and Wildlife Commission removed the gray wolf from the list of species protected under the Oregon Endangered Species Act. Respondents assert that the petition for judicial review is moot because, after petitioners filed their petition for judicial review, the legislature enacted Oregon Laws 2016, chapter 36, which "ratified as satisfying the elements of ORS 496.176 and approved" the delisting. In respondents' view, Oregon Laws 2016, chapter 36, precludes judicial review, because the Court of Appeals cannot grant the relief that petitioners seek. Petitioners respond by highlighting comments made by the proponents of Oregon Laws 2016, chapter 36, and arguing that the law was merely an "expression of legislative agreement" that does not have legal effect. Alternatively, petitioners contend that, if Oregon Laws 2016, chapter 36, has the legal effect of rendering judicial review moot, the law offends the principle of separation of powers required by Article III, section 1, of the Oregon Constitution. *Held*: Petitioners' rule challenge is moot, and Oregon Laws 2016, chapter 36, does not violate Article III, section 1.

Petition dismissed.

Daniel R. Kruse argued the cause for petitioners. Also on the briefs was Nicholas Cady.

Carson L. Whitehead argued the cause for respondents. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Caleb R. Trotter argued the cause for intervenor-respondents Oregon Cattlemen's Association and Oregon Farm Bureau Federation. Also on the brief were Damien M. Schiff, Pacific Legal Foundation; Caroline Lobdell, Scott W. Horngren, and Western Resources Legal Center.

Dominic M. Carollo argued the cause for intervenor-respondent Wallowa County. Also on the brief were Christopher T. Griffith and Yockim Carollo LLP.

Julie A. Weis and Haglund Kelley LLP filed the brief *amicus curiae* for Rocky Mountain Elk Foundation.

Before Armstrong, Presiding Judge, and Shorr, Judge, and James, Judge.

ARMSTRONG, P. J.

Petition dismissed.

**ARMSTRONG, P. J.**

Respondent Oregon Fish and Wildlife Commission (the commission) removed the species *Canis lupus*, commonly known as the gray wolf, from the list of species protected under the Oregon Endangered Species Act (OESA). As allowed by ORS 183.400(1),[1] petitioners Cascadia Wildlands, Center for Biological Diversity, and Oregon Wild seek judicial review of the amendment to OAR 635-100-0125, the rule in which the gray wolf was delisted as an endangered species under the OESA (the delisting), asserting that that decision exceeded the commission's statutory authority and did not comply with applicable rulemaking procedures.[2] In particular, petitioners contend that the gray wolf remains an endangered species in Oregon, and that the commission's conclusion to the contrary was flawed because the gray wolf is nonexistent in the vast majority of its suitable range in Oregon and the decision was not based on scientifically reliable information or the best available scientific data.

Respondents (and intervenors Wallowa County, Oregon Cattlemen's Association, and the Oregon Farm Bureau Federation), in addition to disputing the merits of petitioners' rule challenge, assert that the petition for judicial review is moot because, after petitioners filed their petition for judicial review, the legislature enacted Oregon Laws 2016, chapter 36, which "ratified as satisfying the elements of ORS 496.176 and approved" the delisting. In respondents' view, because Oregon Laws 2016, chapter 36, precludes judicial review, we cannot grant the relief that petitioners seek, and the petition is therefore moot. Petitioners respond, highlighting comments made by the proponents of Oregon Laws 2016, chapter 36, that the law was merely an "expression of legislative agreement" that does not have legal

---

[1] ORS 183.400(1) provides that the "validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases."

[2] ORS 183.400(4) provides that we can declare a rule invalid only if the rule

"(a)  Violates constitutional provisions;

"(b)  Exceeds the statutory authority of the agency; or

"(c)  Was adopted without compliance with applicable rulemaking procedures."

effect. Alternatively, petitioners contend that, if we construe Oregon Laws 2016, chapter 36, as having the legal effect of rendering judicial review moot, the law offends the principle of separation of powers required by Article III, section 1, of the Oregon Constitution.[3] For the reasons we explain below, we agree with respondents and conclude that petitioners' rule challenge is moot. We also conclude that Oregon Laws 2016, chapter 36, does not violate Article III, section 1. We therefore dismiss the petition for judicial review.

Before we address the effect and constitutionality of Oregon Laws 2016, chapter 36, we briefly summarize the OESA, the status of the gray wolf in Oregon, and the circumstances of the legislature's enactment of Oregon Laws 2016, chapter 36. The OESA directs the commission to "conduct investigations of wildlife species native to this state and shall determine whether any such species is a threatened or an endangered species" and to "establish and publish, and from time to time revise" by rule "a list of wildlife species that are threatened species or endangered species." ORS 496.172(1), (2). As noted, the applicable OESA rule is OAR 635-100-0125 (the Oregon list). "The Commission, by rule, may add or remove from either list, or change the status of any species on the lists, upon a determination that the species is or is not a threatened or endangered species." ORS 496.762(2). Among other requirements, ORS 496.176(3) provides that the commission's decision about the biological status of a species must be "based on documented and verifiable scientific information." Further, ORS 496.004(6), (17), and OAR 635-100-0112(1) impose a requirement that a species not be endangered or threatened in "any significant portion of its range."

Additionally, ORS 496.176 provides for the amendment of the Oregon list by petition, on the commission's own

---

[3] Article III, section 1, provides:

"The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; *and no person charged with official duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided.*"

(Emphasis added.)

emergency action, or periodically at least every five years. ORS 496.176(5) ("Any person may petition the commission to, by rule, add, remove or change the status of a species on the list."); ORS 496.176(7)(a) (the commission must "take emergency action to add a species to the list of threatened or endangered species if it determines there is a significant threat to the continued existence of the species within the state"); ORS 496.176(8) (the commission must "periodically review the status of all threatened and endangered species" on the Oregon list "at least once every five years").

As for the gray wolf, the species was once numerous in Oregon but, with western migration of Euro-American settlers, was extirpated from the state, mostly because of cultural antipathy toward wolves and because farmers and ranchers found it necessary to kill wolves to protect their livestock.[4] The last of those wolves native to the state was killed in 1946. When the legislature enacted the Oregon list in 1997, no wolves were known to exist in Oregon, and the gray wolf was classified as endangered. In 2005, respondent Oregon Department of Fish and Wildlife (ODFW) adopted the Oregon Wolf Conservation and Management Plan (the wolf plan) to "ensure the conservation of gray wolves as required by Oregon law while protecting the social and economic interests of all Oregonians." The plan comprises three phases: Phase 1 has the goal of achieving four breeding pairs of wolves in eastern Oregon for three consecutive years; Phase 2 has the objective of achieving seven breeding pairs in eastern Oregon for three consecutive years, which is deemed sufficient by ODFW for delisting; and Phase 3 is meant to ensure that the wolf population neither declines below Phase 2 population levels nor increases to population levels that "cause conflicts with other land uses." In the late 1990s, wolves began to arrive in the state from Idaho and, several years later, ODFW viewed the population of wolves as satisfying Phase 2 population levels and proposed to the commission that it delist the wolves.

On November 9, 2015, the commission agreed with ODFW's proposed delisting and amended the Oregon list

---

[4] The factual background presented here, which is not disputed by petitioners, is taken from ODFW's Wolf Conservation and Management Plan.

to remove the gray wolf from it. Petitioners sought judicial review via this rule challenge on December 31, 2015.[5] On March 2, 2016, the legislature passed House Bill (HB) 4040, which provides:

> "SECTION 1.  The administrative rule amendment adopted by the State Fish and Wildlife Commission on November 9, 2015, to remove Canis lupus, commonly known as the gray wolf, from the state lists of threatened species or endangered species established pursuant to ORS 496.172 (2), is ratified as satisfying the elements of ORS 496.176 and approved.
>
> "SECTION 2.  This 2016 Act being necessary for the immediate preservation of the public peace, health and safety, an emergency is declared to exist, and this 2016 Act takes effect on its passage."

Oregon Laws 2016, chapter 36, sections 1, 2. Oregon Laws 2016, chapter 36, includes a preamble, in which, among other declarations, the legislature declared that "a Canis lupus population has been reestablished in Oregon and has been increasing in both distribution and abundance since 2008"; "Canis lupus is not now and is not likely in the foreseeable future to be in danger of extinction in Oregon"; "Canis lupus has adequate protection under existing state programs, laws and regulations, including the Oregon Wolf Conservation and Management Plan and associated rules adopted by the State Fish and Wildlife Commission"; and "the commission developed extensive analyses and assessments that were made publicly available for review and comment through a series of public hearings." The governor signed HB 4040 into

---

[5] Petitioners argue that (1) because the gray wolf is nonexistent in western Oregon, the commission incorrectly determined that the gray wolf was not in danger of extinction throughout "any significant portion" of its range in the state, ORS 496.004(6), (17), and OAR 635-100-0112(1), and (2) because ODFW's proposal to delist was "based on three scientific documents proposed" by ODFW without peer review, the decision to delist was "invalid because it was not based on sufficiently vetted and reliable scientific information." ORS 496.176(3), ORS 496.171(4) ("'Verifiable' means scientific information reviewed by a scientific peer review of outside experts who do not otherwise have a vested interest in the process."), and OAR 635-100-0112 (like ORS 496.176(3), (a listing determination must be based on "documented and verifiable information related to the species' biological status"). They further argue that, because the commission did not consider scientific views of the gray wolves' biological status that were contrary to the ODFW's conclusions, the decision to delist was not based "upon review of the best available scientific and other data." OAR 635-100-0112.

law on March 14, 2016, and HB 4040 was enacted as Oregon Laws 2016, chapter 36. Because an emergency was declared, the act took effect immediately.

Soon after, respondents filed a notice of probable mootness, asserting that the enactment of Oregon Laws 2016, chapter 36, likely rendered judicial review of the delisting moot. Petitioners did not respond to that notice, and the Appellate Commissioner dismissed the petition for judicial review as moot. However, after petitioners urged the court to reconsider the dismissal, the court determined that the validity of Oregon Laws 2016, chapter 36, was more appropriately decided by a merits panel of this court and vacated the dismissal order. Now, after full briefing and oral arguments on the issue, the parties reprise their mootness arguments.

## LEGAL EFFECT OF
## OREGON LAWS 2016, CHAPTER 36

As noted, petitioners contend that Oregon Laws 2016, chapter 36, has no legal effect; rather, petitioners contend, the law is merely a "legislative expression of agreement." That is so, they posit, for three reasons. First, because the legislature could have amended ORS 496.176 to explicitly exclude the gray wolf from the OESA or exempt the gray wolf from the delisting process set out in ORS 496.176, the fact that the legislature did not mean that its intention in passing HB 4040 was not "substantive." Second, petitioners argue that the "passive and indirect" text in Oregon Laws 2016, chapter 36, section 1—the commission's delisting "is ratified as satisfying the elements of ORS 496.176"—renders the provision's meaning ambiguous. Third, petitioners point to legislative history, in particular, statements made by HB 4040's proponents that suggested that language in the bill, if enacted, would not preclude judicial review. Respondents answer that the meaning of Oregon Laws 2016, chapter 36, is plain. In respondents' view, the meaning of the word "ratified" as having legal effect could not be clearer. Given that clarity, respondents assert, there is no need to look at the legislative history and, even if we were to look at it, such history is mixed and provides no clear indication of what the legislature intended.

Because the parties' arguments require us to discern the legislature's intentions in enacting Oregon Laws 2016, chapter 36, we examine the text, in context, of the measure, which provides the best evidence of the legislature's intentions. *Dept. of Human Services v. J. C.*, 365 Or 223, 230, 444 P3d 1098 (2019); *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). We also consider legislative history to the extent that it is pertinent, *Schutz v. La Costita III, Inc.*, 364 Or 536, 544, 436 P3d 776 (2019), and are mindful that we are obligated to

> "consider proffered legislative history only for whatever it is worth—and what it is worth is for the court to decide. When the text of a statute is truly capable of having only one meaning, no weight can be given to legislative history that suggests—or even confirms—that legislators intended something different."

*Gaines*, 346 Or at 173.

Accordingly, we turn to section 1 of Oregon Laws 2016, chapter 36, which states that the delisting is "ratified as satisfying the elements of ORS 496.176 and approved." The ordinary meaning of "ratify" in this context is "to approve and sanction esp. formally (as the act of an agent or servant) : make (as a treaty) valid or legally operative." *Webster's Third New Int'l Dictionary* 1885 (unabridged ed 2002). In other words, "ratify" means the act of some person or entity—with the lawful authority to do so—giving formal and legally operative effect to another person's or entity's action. Because the task of the commission with respect to the endangered species status of the gray wolf was to determine whether the policy criteria set out in ORS 496.176 were met, "ratified as satisfying the elements of ORS 496.176" means that the legislature agreed with the commission's necessary findings to delist the gray wolf and made those conclusions "valid or legally operative." *Cf. Coos County v. Oddy*, 156 Or 546, 557, 68 P2d 1064 (1937) (legislature may curatively "ratify" acts retroactive in effect if it could have authorized the legislative act in the first instance).

The meaning of "ratify" in the provision is unambiguous—it is the act of giving formal and legally operative effect to another entity's action. Giving that provision effect,

as we must, *see Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 311, 297 P3d 1256 (2013) ("As a general rule, we construe a statute in a manner that gives effect, if possible, to all its provisions."), we conclude that, when it chose to "ratify" the delisting, the legislature must have intended something more than the expression of some manner of nonbinding agreement with the delisting. Specifically, by using the word "ratify," the legislature intended to confirm that the commission's rule delisting the gray wolf legally satisfied ORS 496.176, effectively rendering judicial review under ORS 183.400 moot.

Had the legislature meant to convey something other than that, it could have passed a resolution (adopted by one chamber) or a concurrent resolution (adopted by both chambers), which allows the legislature to express a *non-legal* "opinion or sentiment on a matter of public interest" or its "legislative approval of action taken by someone else." Oregon Legislative Assembly, *Form and Style Manual for Legislative Measures* 58 (2019-2020). The legislature did not do that. Given that Oregon Laws 2016, chapter 36, has all the formal indicia of a legally binding measure,[6] and was passed by both houses and signed by the governor, that the legislature intended the measure to have some effect beyond expressing a sentiment of agreement is a more plausible explanation of legislative intent than the one advanced by petitioners.

Further, petitioners' argument that the legislature's use of the passive voice in section 1 of Oregon Laws 2016,

---

[6] Oregon Laws 2016, chapter 36, includes all the formal parts of a bill that the legislature understands is required for it to provide an enacted legislative measure with statutory effect. The legislature describes measures that have "the effect of statutory law," such as amendments or repeals of existing law or the creation of new law, as a "bill," and a bill's text includes formal parts and organization. Oregon Legislative Assembly, *Form and Style Manual for Legislative Measures* 21 (2019-2020). In this case, Oregon Laws 2016, chapter 36 has a heading ("Act"); a title ("Relating to Canis lupus; and declaring an emergency"); an enacting clause ("Be it enacted by the People of the State of Oregon"); and a body comprised of two sections—the first providing the bill's "leading purpose" (the commission's November 9, 2015, delisting is "ratified as satisfying the elements of ORS 496.176 and approved") and the second providing when the act would take effect (declaring that an emergency exists and that the Act is effective immediately on its passage). *See id.* at 21-24 (2019-2020) (setting forth the formal parts of a "measure intended to have the effect of statutory law"); Legislative Counsel, *Bill Drafting Manual* chapters 5, 6 (18th ed 2018).

chapter 36, creates an ambiguity is not well taken. It is true that its use of the passive voice can create ambiguity or uncertainty, but that generally applies when the use of passive voice makes it unclear to whom the legislature has addressed a statutory prohibition. *See Alfieri v. Solomon*, 358 Or 383, 399-400, 365 P3d 99 (2015) (noting that ORS 36.110(7) was written in the passive voice and the legislature did not explicitly say to whom the statute was directed); *State v. Serrano*, 346 Or 311, 322, 210 P3d 892 (2009) (pertinent part of OEC 505(1)(a) is written in the passive voice and does not identify the actor; it was initially unclear whose intention governs confidentiality for purposes of OEC 505(2)). Here, it is clear that the statute is directed at the administrative rule delisting the gray wolf and that it is the legislature that is ratifying that rule. We fail to see how the passive voice in Oregon Laws 2016, chapter 36, creates ambiguity or how drafting the statute in the active voice would have added clarity to the legislature's intentions.

We likewise find unavailing petitioners' argument that, because the legislature could have enacted an amendment to ORS 496.176—but did not—in the manner that it originally exempted the Aleutian Canada goose from the Oregon list, ORS 496.176(9)(b) (the commission "[m]ay not include Branta canadensis leucopareia, commonly known as the Aleutian Canada goose, on the lists of threatened species or endangered species"), or amended ORS 496.176 to exempt the gray wolf from the delisting process, Oregon Laws 2016, chapter 36, was not intended to have any legal effect on this case. Setting aside that petitioners do not explain how that argument fits within the usual *Gaines* framework to discern the legislature's intentions, petitioners' argument misses the critical difference between what the legislature did and the effect of any express amendment of ORS 496.176. That is, the legislature left open the ability of the commission to relist the gray wolf if the population were to decline, consideration of which is allowed for or required under ORS 496.176(5), (7), or (8). *See* 300 Or App at 651-52. Whereas a species' status is subject to change by a rulemaking process periodically, by petition, or the commission's own action, an amendment to ORS 496.176 establishes a species' status as

a matter of law unless or until the legislature again amends ORS 496.176. Because the legislature could have made a more restrictive legislative change to the status of the gray wolf by amending ORS 496.176, it does not necessarily follow that, because it did not and instead enacted Oregon Laws 2016, chapter 36, the legislature intended that the measure have no legal effect whatsoever. Rather, what the legislature intended with Oregon Laws 2016, chapter 36, was to give legislative effect to the commission's decision to delist the gray wolf so that the decision would be unimpeded by judicial review, and to allow for future decision-making by the commission concerning the endangered status of the gray wolf should its numbers decline.

In support of their argument that that was not the legislature's intention, petitioners point out that this case was well known to legislators and that, when some of HB 4040's proponents discussed or were asked about the effect of HB 4040 on the pending judicial review, both in committee and during the House floor discussion, the proponents minimized or discounted the effect the bill would have on the pending litigation. For example, Representative Brad Witt said that he had "done the utmost to make sure that [HB 4040] does not preclude the possibility of [judicial review]." Audio Recording, House Committee on Agricultural and Natural Resources, HB 4040, Feb 4, 2016, at 1:53:10 (statement of Rep Brad Witt), https://olis.leg.state.or.us (accessed Aug 30, 2019). Likewise, Representative Greg Barreto commented during the floor discussion of HB 4040 that petitioners "can still have their day in court" but that what HB 4040 "does, is it allows the legislature to affirm or to agree with this Commission * * * that has basically approved of delisting." Audio Recording, Floor Discussion of the House of Representatives Floor Debate, HB 4040, Feb 12, 2016, at 49:20 (comment of Rep Greg Barreto), https://olis.leg.state. or.us (accessed Aug 30, 2019); *id*. at 55:12 ("[T]here's no motive on my part as far as disrupting anything. It's basically affirming. * * * It's not our objective to usurp the responsibility of the commission."). In petitioners' view, those statements are representative of the legislature's understanding of the effect of Oregon Laws 2016, chapter 36, and because, according to petitioners, the statutory text of Oregon Laws

2016, chapter 36, is ambiguous, those statements should be determinative of the legislature's intentions.

We disagree. Although it is true that there were statements made in committee meetings and on the House floor that could be viewed as lending support to petitioners' argument,[7] when the whole legislative record is considered, two things are evident. First, it was clear that there was concern about the pending judicial review and that proponents believed that HB 4040 was necessary to allow ODFW to proceed to Phase 3 of the plan without the impediment of that review. For example, Representative Barreto stated that the

> "reason for the legislative shoring up of the [commission's] decision was, they knew, we knew, everyone knew, there would be lawsuits contesting this. The problem with that is litigation takes years to work through ***. *** For the plan to work, that was agreed on ten years ago, the delisting process must take place. If there is an interruption in that, there is an interruption in the plan."

Audio Recording, House Committee on Agricultural and Natural Resources, HB 4040, Feb 4, 2016, at 13:00 (statement of Rep Greg Barreto), https://olis.leg.state.or.us (accessed Aug 30, 2019). John O'Keefe, representing the Cattlemen's Association, said that the bill is "important because of legal challenges that will drag this issue out for a long time." *Id*. at 22:36 (statement by John O'Keefe, Cattlemen's Association); *see also* Testimony, House Committee on Agricultural and Natural Resources, HB 4040, Feb 4, 2016 (statement of John O'Keefe) (legislation will provide certainty to beef producers and avoid costly and misplaced legal challenges). We fail to see how a nonbinding expression of legislative agreement would advance the intended purpose of moving the plan forward by avoiding the prospect that this court would declare the delisting invalid. Certainly, a statement of legislative agreement would have no bearing on how we construe ORS 496.176. *See DeFazio v. WPPSS*, 296 Or 550, 561, 679 P2d

---

[7] Some of the statements that petitioners point to evince an intention not to usurp the authority of the *commission*. *See, e.g.*, Audio Recording, House Committee on Agricultural and Natural Resources, HB 4040, Feb 4, 2016, at 55:12 (statement of Rep Greg Barreto) ("It's not our objective to usurp the responsibility of the commission.").

1316 (1984) ("The views legislators have of existing law may shed light on a new enactment, but it is of no weight in interpreting a law enacted by their predecessors.").

Second, opponents of HB 4040, including petitioners, commented that they opposed the bill because it was their view that HB 4040 circumvented judicial review. *See, e.g.*, Testimony, House Committee on Agricultural and Natural Resources, HB 4040, Feb 4, 2016 (statement of Sean Stevens, Oregon Wild) ("Rep Gorsek asked Sen Hansell and Rep Barreto if their legislation was intended to preempt a review by the courts. They answered 'no.' However, HB 4040 * * *, if passed, would indeed circumvent the legal review process."); *id*. (statement by Cascadia Wildlands representative Nick Cady) ("I am writing you to urge you to not entertain HB 4040. This bill precludes judicial review of a recent decision by [the commission] to remove gray wolves from Oregon's list of threatened and endangered species."); Audio Recording, Senate Floor Debate, Mar 2, 2016, at 6:25:40 (comment of Sen Michael Dembrow) (reason why he opposed HB 4040 was because he believed "it is not the job to come in and get in the way of judicial review of a decision that was made by the agency"), https://olis.leg.state.or.us (accessed Aug 30, 2019); Audio Recording, House of Representatives Floor Debate, HB 4040, Feb 12, 2016, at 52:30 (comment of Rep Chris Gorsek ("We really should not interfere in this [process] and take any sides. We have ODFW—they've done their thing—but we frequently need without the interference of Congress or the legislatures to have judicial review."), https://olis.leg.state.or.us (accessed Aug 30, 2019).

In sum, even if we were to assume that Oregon Laws 2016, chapter 36, is ambiguous in the manner asserted by petitioners, we are unpersuaded that the legislative history identified by petitioners indicates that the legislature understood HB 4040 to be a nonbinding legislative expression of agreement with the delisting. *See Conrady v. Lincoln City*, 260 Or App 115, 128, 316 P3d 413 (2013), *rev den*, 355 Or 567 (2014) ("Given the cross-cutting remarks on the House floor, we cannot say with any certainty what the House understood to be the effect of HB 2784 on the siting of shooting ranges, let alone what the legislature as a whole understood."); *Gaines*, 346 Or at 172 (although

legislative history "may be used to confirm seemingly plain meaning and even to illuminate it; a party also may use legislative history to attempt to convince a court that superficially clear language actually is not so plain at all—that is, that there is a kind of latent ambiguity in the statute ***, a party seeking to overcome seemingly plain and unambiguous text with legislative history has a difficult task before it"); *see also Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 539 n 4, 888 P2d 544 (1995) (Graber, J., dissenting) (observing that "an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment"). Given that the legislature "ratified" the delisting and the circumstances of HB 4040's passage, we reject petitioners' argument concerning the effect of Oregon Laws 2016, chapter 36. Rather, Oregon Laws 2016, chapter 36, ratifies the commission's decision as substantively complying with the requirements of the OESA and is intended to provide the delisting with the legislative effect of precluding as moot challenges that assert otherwise. With that answered, we turn to whether Oregon Laws 2016, chapter 36 violated Article III, section 1.

## SEPARATION OF POWERS

Article III, section 1, provides:

> "The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; *and no person charged with official duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided.*"

(Emphasis added.) The Supreme Court has explained that, "[b]ecause the roles of governmental actors frequently overlap, *** the separation of powers doctrine does not require an 'absolute separation between the departments of government.'" *MacPherson v. DAS*, 340 Or 117, 134, 130 P3d 308 (2006) (quoting *Rooney v. Kulongoski,* 322 Or 15, 28, 902 P2d 1143 (1995)); *see Sadler v. Oregon State Bar*, 275 Or 279, 285, 550 P2d 1218 (1976) ("The separation of powers principle cannot in practice work absolutely; there is a necessary overlap between the governmental functions. The rule has evolved that legislation can affect the practice of law so long

as it does not unduly burden or substantially interfere with the judiciary.").

Rather, analyzing whether a governmental branch has violated Article III, section 1, involves two inquiries. The first inquiry is "whether one department of government has 'unduly burdened' the actions of another department where the constitution has committed the responsibility for the governmental activity in question to that latter department." *MacPherson*, 340 Or at 134 (citing and quoting *Rooney*, 322 Or at 28); *State v. Speedis*, 350 Or 424, 431, 256 P3d 1061 (2011) (describing whether one branch of government has unduly burdened the actions of another branch in carrying out its "core functions"). The first inquiry reflects "the underlying principle that separation of powers seeks to avoid the potential for coercive influence between governmental departments." *Rooney*, 322 Or at 28.  The second inquiry is "whether one department has performed functions that the constitution commits to another department." *MacPherson*, 340 Or at 134 (citing *Rooney*, 322 Or at 28). The second inquiry "corresponds primarily to the underlying principle that separation of powers seeks to avoid the potential for concentration of separate powers in one department." *Rooney*, 322 Or at 28.

Petitioners argue that Oregon Laws 2016, chapter 36, performs an entirely judicial function, thus violating Article III, section 1. That is because, petitioners assert, the legislature neither amended nor repealed ORS 496.176, although it had the authority to do that. And, because the legislature did not exercise that authority—it did not create new law—it did something else when it ratified the delisting "as satisfying the elements of ORS 496.176." That something else, in petitioners' view, is what the judicial branch is supposed to do, which is applying laws to specific facts to decide live cases or controversies between disputing parties. Petitioners assert that "whether a particular agency decision satisfies the requirements of ORS 496.176 is a case-specific and fact-specific inquiry," which petitioners describe as a "'well-established role for the court.'" (Quoting *Rooney*, 322 Or at 28-29.) Respondents answer that there is only a separation of powers violation if the problem is clear and that, in this instance, Oregon Laws 2016, chapter 36, is not

an exercise of judicial decision-making. Rather, the ratification is a legislative function; that is, it is an exercise of the legislature's plenary power "to select the objectives of legislation * * *, except as it is limited by the state and federal constitutions." *State v. Moyle*, 299 Or 691, 699, 705 P2d 740 (1985)).

We agree with respondents: Oregon Laws 2016, chapter 36, does not violate the separation of powers doctrine under Article III, section 1. However, before we explain why, we note that, although petitioners mention both inquires illustrated in *Rooney*, they have not adequately explained how a law intended to preclude or relieve us of our task of judicially reviewing the commission's delisting "unduly burdens" or is a "coercive influence" of our constitutionally committed duties or core functions. Rather, the thrust of petitioners' argument concerns the second inquiry, which is that the legislature violated Article III, section 1, because it performed a function committed to the judiciary. Accordingly, the second inquiry is the one that we address here.

In enacting Oregon Laws 2016, chapter 36, the legislature decided, based on its own consideration of the science and the objective of proceeding to Phase 3 of the wolf plan, as proposed by ODFW,[8] that the delisting satisfied the criteria set out in ORS 496.176. That is a policy choice, and that choice was well within the legislature's plenary power to make. Further, the legislature has delegated the make-up of the Oregon list to the commission. That is, the legislature created a process for the commission to comply with the legislature's policy choices embodied in the OESA and make decisions in the manner the legislature intends so that the legislature is relieved of spending its time monitoring that

---

[8] By contrast, were we to judicially review petitioners' challenge on the merits, we would neither "examine the factual basis of the rule" nor consider whether the agency's decision to adopt the rule is supported by the evidence. *Unified Sewerage Agency v. Dept. of Environ. Quality*, 117 Or App 29, 33, 843 P2d 502 (1992). Nor would the policy objectives of ODFW and its wolf plan have any bearing on our decision declaring the rule valid or invalid. Instead, our task would be to determine whether the substance of the commission's action "departed from a legal standard expressed or implied in the particular law being administered, or contravened by some other applicable statute," *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984), or complied with applicable rulemaking standards, ORS 183.400(4)(c).

decision-making process. That process is quasi-legislative. *See Fishermen Against Irrespon. Realloc. v. Fish and Wild.*, 222 Or App 353, 359, 193 P3d 1014 (2008) (describing the commission's rule adoption as "quasi-legislative"). If the legislature decides at some point to weigh in on that process and ratify, with legislative effect, a quasi-legislative task that the legislature itself has delegated, that decision is a legislative function. It does not offend the separation of powers doctrine for the legislature to do that.[9]

Petitioners' separation-of-powers argument suffers from another critical defect: A rule challenge under ORS 183.400 is statutorily provided by the legislature, not constitutionally committed to the judiciary. *See Wolf v. Oregon Lottery Commission*, 344 Or 345, 347, 182 P3d 180 (2008) (Under "Oregon law, any person dissatisfied with an administrative rule promulgated by an Oregon administrative agency may challenge the validity of that rule in an original proceeding filed in the Court of Appeals."). A "rule" is defined, in part, as "any agency directive, standard, regulation or statement of general applicability that implements, interprets or prescribes law or policy," ORS 183.310(9). A rule-making challenge contests a policy change of "general rather than individualized application," and is not a federal constitutional due process right, *Burke v. Children's Services Division*, 288 Or 533, 547, 607 P2d 141 (1980) (explaining that, unlike contested-case orders, there is no due process right), nor is it afforded by any state constitutional right. Rather, ORS 183.400 creates a legislatively provided pathway for a party to challenge whether an executive agency's

---

[9] To the extent that petitioners' argument implicitly suggests that the timing of Oregon Laws 2016, chapter 36, or the legislature's awareness of petitioners' pending petition for judicial review implicates a judicial function, we reject it. In *A. K. H. v. R. C. T.*, 312 Or 497, 501-02, 822 P2d 135 (1991), the defendant argued that, because the legislative history of an amendment to a limitations statute indicated an attempt to affect how his pending case should be resolved by the Supreme Court, the amendment violated Article III, section 1. The Supreme Court disagreed, explaining that it "is a function of legislation to draw lines. We do not see how legislative awareness of the facts of a particular case that would fall within the terms of its enactment of a general law in any way changes the purely legislative nature of the enactment." *Id.* (emphasis omitted). Likewise, here, merely because the legislature ratified the delisting after petitioners filed their petition for judicial review, while the matter was pending before us, does not violate Article III, section 1.

adoption of a rule exceeds what is statutorily authorized by the legislature. In this case, the legislature made a policy choice that the ORS 183.400 process is not necessary and specifically authorized the rule; that the legislature decides for itself whether a rule is consistent with the policy preferences it has made by statute, as it has done here, does not offend Article III, section 1. Put differently, the legislature is not performing a judicial function constitutionally committed to the judicial branch when it decides that the rulemaking process has achieved what the legislature wanted it to achieve.

## MOOTNESS

A matter is moot if "resolving the merits of a claim will have no practical effect on the rights of the parties." *Corey v. DLCD*, 344 Or 457, 464, 184 P3d 1109 (2008) (concluding that, because DLCD's Measure 37 order had no continuing viability in light of the passage of Measure 49, a decision as to whether the Supreme Court had jurisdiction to review the order could have no practical effect on the parties, thus rendering the case moot). In this case, the legislature has ratified the delisting, thereby providing the delisting with the statutory effect of removing it from a rule challenge under ORS 183.400. Consequently, a decision on our part regarding petitioners' challenge would have no practical effect, and the petition is therefore moot.

Petition dismissed.